OPINION OF THE COURT
Simons, J.
On September 19, 1986 plaintiff Grace Plaza of Great Neck, a long-term care facility, admitted Jean Elbaum as a patient. She had been transferred from North Shore University Hospital following treatment for a stroke. At the time of her admission to Grace Plaza, Mrs. Elbaum was in a persistent vegetative state and had to be fed through a gastrostomy tube. In October of 1987, her husband, defendant here, advised plaintiff by letter that it was his wife’s wish that she be allowed to die naturally should she fall into an "irreversible vegetative state”, and he instructed the nursing home to remove Mrs. Elbaum’s feeding tube. At admission, defendant had signed an agreement undertaking responsibility for his wife’s care but when plaintiff declined to remove the feeding *15 tube, he refused to pay for further treatment. This action by plaintiff followed to recover payment for services rendered to Mrs. Elbaum after October 1987. Supreme Court granted defendant summary judgment but the Appellate Division reversed.*
The thrust of the defense is that Mr. Elbaum is not liable because plaintiff breached the admission agreement. Defendant contends that because Mrs. Elbaum had a right under the contract, as well as under statutory and constitutional law, to determine the course of her own treatment and to discontinue life support systems, her continued treatment in contravention of her wishes violated the contract and excused any obligation to pay. In answer, plaintiff states the obvious, that Mrs. Elbaum was unable to state her wishes, that defendant did not present any documentary evidence indicating his wife’s intentions and that he could not make the decision to discontinue life support systems for her (see, Matter of Westchester County Med. Ctr. [O’Connor], 72 NY2d 517; Matter of Storar, 52 NY2d 363, cert denied 454 US 858). Plaintiff asserts that until the courts finally declared what Mrs. Elbaum’s wishes were, it could not know that she did not desire continued nutrition and hydration.
New York law has long recognized the right of competent individuals to decide what happens to their bodies (Schloendorff v Society of N. Y. Hosp., 211 NY 125). That right to personal autonomy is rooted not only in common law but also in the Constitution (Cruzan v Director, Mo. Dept. of Health, 497 US 261, 278-279; Rivers v Katz, 67 NY2d 485, 493) and includes the right to decline even life-preserving treatment (Matter of Fosmire v Nicoleau, 75 NY2d 218, 226; Matter of Westchester County Med. Ctr. [O’Connor], supra; Matter of Eichner [Matter of Storar], 52 NY2d 363, supra). In addition, *16 section 2803-c of New York’s Public Health Law imposes on every nursing home a duty to honor a patient’s decision to refuse treatment. Patients who do not consent and communicate that lack of consent are not liable for any treatment provided in contravention of their wishes (Shapiro v United Med. Serv., 15 NY2d 200).
Defendant contends that the obligation rested on plaintiff to seek a judicial determination of Mrs. Elbaum’s wishes. He correctly points out that her wishes did not come into existence at the moment a court determined what they were; to the contrary and by definition, they existed prior to the onset of her comatose state. There is no principled reason, he asserts, for distinguishing between the rights of competent patients and those of incompetent patients. If Mr. Elbaum is required to pay for services the courts ultimately found Mrs. Elbaum did not desire, her rights have been diminished because she was incompetent. He contends the provider should be required to pay for the undesired care because it denied his wife her legal right to determine the course of her own treatment.
Though decisions in cases such as this may now be facilitated by use of proxies or living wills (see, Public Health Law art 29-C [eff Jan. 18, 1991]), the statutes authorizing such instruments were not in effect at the time in question, and neither side disputes that under the New York law as it then existed, the patient alone had the right to decide on terminating life support systems (see, Matter of Westchester County Med. Ctr. [O’Connor], supra). The law of this State was clear: surrogate decisions are not recognized (Matter of Eichner [Matter of Storar], supra; and see, O’Connor, supra, at 528, see also, concurring opn of Hancock, Jr., J., at 535, and dissenting opn of Simons, J., at 541). Though our rule reserving the right to the patient is more inflexible than that followed by most of our sister States, it is within the power of the individual States to adopt such a rule and also to impose higher standards of proof for determining the wishes of incompetent persons than for determining the wishes of those who are competent (Cruzan v Director, Mo. Dept. of Health, 497 US 261, 287, n 12, supra). Acting on that premise, we have required the families of hopelessly ill patients who are unable to express their wishes with respect to continuing care to establish by clear and convincing evidence that the patient when sentient expressed a clear and settled wish that care should not be continued under the circumstances (see, Matter *17 of Westchester County Med. Ctr. [O’Connor], supra). If a provider harbors some uncertainty on the matter, it acts within the dictates of O’Connor if it refuses to discontinue treatment until the issue is legally determined (see, id., at 531). By doing so, it does not breach a contract of care nor impair its right to be paid for services rendered.
We would but add that in many, perhaps most cases, providers will appropriately consider the family’s evidence on the matter conclusive and honor requests to terminate treatment of a hopelessly ill patient (see, Matter of Eichner [Matter of Storar] supra, at 382). By doing so they not only avoid continued anguish for the family but also avoid imposing on all parties the expense and delay that accompanies legal proceedings to resolve the question. However, judicial resolution of the question may be required if the family members are divided or uncertain in their understanding of the patient’s wishes, if the provider entertains doubts about the state of the law or if it has legitimate professional reservations about the procedure requested. In such cases it may seek a judicial determination of the matter itself or insist that the family do so.
If the provider refuses to act, we find nothing unfair in placing the burden of instituting legal proceedings on those seeking to discontinue treatment. Though the provider has a legal duty to adhere to the known wishes of a patient, a desire to terminate life support does not stand on the same legal footing as a patient’s request for a routine change in treatment. O’Connor instructs decision-makers to "err on the side of life” and makes clear that the burden of establishing an incompetent patient’s desire to die rests squarely with those who are asserting that desire. That burden does not shift simply because a family member has requested termination of life support. If the provider and the family disagree, the family may seek another facility for the patient or it may be able to take the patient into a family member’s home. But if no other recourse is available, it is the family which ultimately is obliged to seek a legal determination establishing the patient’s wishes. As intimates of the patient, the family members have access to the necessary evidence and are in the best position to submit it to a court for consideration.
We have no need to consider what should be the outcome in an action to recover health charges when a provider, in bad faith, refuses to discontinue treatment. None of the courts *18 below found plaintiff acted in bad faith. Considering the uncertain state of the law at the time these events occurred (see, Matter of Delio v Westchester County Med. Ctr., 129 AD2d 1) and plaintiff’s willingness to help find an alternate facility once the dispute over treatment arose, the absence of any finding of bad faith cannot be said to be erroneous as a matter of law. Moreover, the reasonableness of plaintiff’s position is supported by the fact that, after examining the evidence, the trial court and the Appellate Division disagreed on Mrs. Elbaum’s wishes. Indeed, the continued treatment of Mrs. Elbaum was required for much of the period at issue here because plaintiff was subject to a Supreme Court order directing it to continue treatment. Under these circumstances, plaintiff did not breach its contract, and defendant was not excused from paying for his wife’s care.
Finally, we conclude that defendant’s counterclaims for assault and battery and punitive damages were properly dismissed.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

 In March 1989, while the present action was on appeal, Supreme Court determined, in a separate action instituted by defendant, that there was insufficient evidence that Mrs. Elbaum wanted the feeding tube removed. On August 2, 1989 that determination was reversed by the Appellate Division. It directed that in the event the parties were unable to effectuate Mrs. Elbaum’s transfer to a suitable nursing care facility which would accede to Mrs. Elbaum’s wishes concerning the removal of the gastrointestinal tube within 10 days of the date of the opinion and order, the defendants were required to comply with Mrs. Elbaum’s wishes (see, 148 AD2d 244). Following the Appellate Division’s decision, she was discharged from Grace Plaza and died shortly, thereafter. Supreme Court ruled in favor of Mr. Elbaum in the present action on the basis of that decision sustaining Mrs. Elbaum’s wishes to forego further treatment.