OPINION OF THE COURT
Doris Ling-Cohan, J.
To have your minor child die is every parent’s worst nightmare. To have to make the decision to terminate your own child’s existence is beyond most people’s comprehension. However, notwithstanding this, most parents are capable of making a considered decision in their grief, for the best interest of their child, with the help of the child’s medical providers.[1]
This tragic case presents a novel issue which has not been specifically addressed by the Legislature or the courts of this state: May a parent exercise her discretion, which is wholly supported by the other parent and the child’s treating physicians, to withhold life support to her minor child who has been diagnosed to be in a persistent vegetative state with no chance of recovery?
AB is a 3[1]/2-year-old child who resides with her mother CD in Brooklyn, New York.[2] As a healthy child, AB was rambunctious, happy and loving. Sadly, on December 31, 2002, AB had a seizure, collapsed and was rushed unconscious to New York City Health and Hospitals Corporation’s (HHC) Kings County Hospital. AB does not respond to any stimulation and is unable to feel joy or any other emotion; she cannot smile or respond to her mother; she cannot play, eat or speak. In short, AB requires extreme medical intervention for all of her activities of daily living, including a mechanical respirator to breathe. To this day, AB remains unconscious in King’s County Pediatric Intensive Care Unit, having been diagnosed to be in a persistent vegetative state (PVS).
After much reflection and consultation, AB’s mother now asks this court to rule that she has the authority to remove AB from the mechanical respirator. After many discussions, with the advice of AB’s medical providers, and upon deep consideration, CD believes that it is in the best interest of her child to remove her from the mechanical respirator so that she can die *942 in peace. HHC’s policies, however, do not permit hospital staff to withdraw or withhold care — such as a mechanical respirator — in cases such as this. Absent intervention by this court, AB is likely to languish in a persistent vegetative state.
I. Hearing
The court appointed a guardian ad litem for AB and held a hearing in which the mother CD, Dr. Gilbert M. Goldman and the guardian testified. In addition, on consent of HHC, the affirmations of Dr. John Lantos, Dr. Alan R. Fleischman, Professor Nancy Dubler and Dr. Goldman were made a part of the record. HHC consented to the jurisdiction of this court and participated in the hearing. The record reflects the following and constitutes the court’s finding of facts.
AB, a SVs-year-old child, lives with her mother, CD, who is employed as a home care attendant. On New Year’s Eve 2002, AB experienced shortness of breath and collapsed, apparently undergoing a seizure.
AB was rushed in an ambulance to Kings County Hospital Emergency Room where she was immediately treated with a tracheal intubation and placed on a mechanical ventilator. AB was sedated and transferred to the Pediatric Intensive Care Unit where she was evaluated by a pediatric cardiologist. The cardiologist determined that AB had a cardiac arrhythmia. AB never regained consciousness.
HHC’s physicians have performed a series of neurological evaluations, electroencephalography and magnetic resonance imaging, which all confirm that AB suffered a massive loss of brain functioning. AB does not respond to stimulation. She can only breathe when she is attached to a mechanical ventilator. She is provided nourishment through a feeding tube inserted into her stomach.
HHC’s physicians and neurologists have made a definitive diagnosis that AB is in a persistent vegetative state. Dr. Goldman defined persistent vegetative state as being in permanent unconsciousness where the patient is totally unaware of the environment, without awareness of sensation and the ability to think or interact.
Dr. Alan Fleischman, an independent pediatrician, has confirmed HHC’s diagnosis. AB’s treating physicians, Dr. Goldman and Dr. Fleischman, as well as Dr. John Lantos, an expert in pediatrics and bioethics, all concur that the chance of AB’s return to an awareness of, or interaction with, her environment is virtually impossible.
*943 Dr. Lautos, Section Chief for General Pediatrics and Associate Director for the Center for Clinical Medical Ethics at the University of Chicago, reviewed AB’s case and medical records. From this review, he has determined that AB should be removed from the mechanical ventilator because (1) she has no quality of life to speak of in that she cannot experience joy or perform any activities of daily living on her own, and (2) her parents believe that it would be in her best interest.
Dr. Goldman, AB’s treating physician, opines not only that AB is in a persistent vegetative state, but that there is no possibility of recovery, and that consistent with the American Medical Association’s guidelines concerning treatment decisions for seriously ill newborns (which he considers applicable in this context), CD is making an informed decision about the removal of the mechanical ventilator in AB’s best interest. Because of AB’s unique condition, Dr. Goldman also feels that such a decision is not only informed, but correct. According to Dr. Goldman, AB’s condition is extremely severe and rare. He stated that, typically, children who are in a persistent vegetative state are able to breathe without the assistance of a mechanical ventilator; however, this case presents the particularly devastating and rare combination of comorbidities in which the child is permanently unconscious and unable to breathe on her own. Dr. Goldman concludes that it is medically and ethically appropriate at this point to observe the mother’s wishes and remove the ventilator given that it is merely postponing AB’s eventual death.
CD is a loving mother who visits AB every day in the hospital. Her daughter cannot respond or speak when CD speaks or touches her. CD believes that there is nothing peaceful about her daughter’s condition. CD’s grief is so severe that she is unable to sleep at night and cannot return to the home she once shared with her daughter. She has been unable to work as a home care attendant since her child has entered the hospital. The mother, and her close knit family, feel paralyzed. They cannot grieve the loss of AB because she is not medically dead; yet, she is not fully alive. One of CD’s sisters arrived from Canada immediately after AB’s seizure and cannot go home until she feels that there has been some closure. CD testified that her decision to remove the mechanical ventilator was a hard decision to make; however, she believes that it is in the best interest of her daughter in that it would allow her daughter to be at peace.
The father of AB, who is separated from the mother, supports the mother’s decision as indicated by his affidavit and as *944 confirmed by the guardian ad litem. Further, he has been notified of this proceeding, but has chosen not to appear.
The guardian ad litem testified that she was impressed by the warm and respectful relationship that the medical and nursing staff had with the mother and that CD is making a “conscientious, fully informed decision.” The guardian opined that there is nothing peaceful about AB’s prolonged life on a ventilator and that keeping her in such a state seems cruel. She also observed that there is no economic incentive motivating CD’s decision; it is a decision based purely upon the best interest of AB. The guardian found no disability discrimination. Additionally, the guardian unequivocally states that there has never been any suggestion of neglect or abuse of AB. According to the guardian, the medical technology being employed is both futile and invasive; and, inasmuch as the child receives absolutely no benefit, there is a dignity issue and disrespectfulness to the child from the continued bodily invasions. It was her opinion that prolonging this would have a devastating effect on the family, which the child is a part of, and ultimately not in the child’s best interest.
II. Discussion
A. A Survey of New York Case Law
It is without question that dramatic advances in medical technology have made it possible to sustain or maintain the lives of many individuals, including infants who would otherwise have died. As this case illustrates, these advances have outstripped the ability of this state to develop an ethical, moral or legal approach for dealing with problems caused by these new possibilities, including those facing the petitioner and others in similar situations.
This case differs from the usual “right to die” case in that typically family members seek court authorization to have life support systems terminated where the incompetent patient has earlier expressed his/her preference regarding such treatment. In these cases, the underlying rationale is based on the patient’s common-law right to control his/her own medical care or self-determination. (See e.g. Matter of Westchester County Med. Ctr. [Hall], 72 NY2d 517 [1988].)
The issues presented herein, however, differ significantly from those presented when the incompetent patient has earlier expressed a clear view regarding such treatment. An infant, by definition, is incapable of making any determinations or *945 formulating any preferences for treatment. Traditionally, when the court cannot determine a patient’s preference, it must rely on the common-law doctrine of parens patriae to decide whether to withdraw life-prolonging treatment. (See Matter of Storar, 52 NY2d 363, 380-382 [1981].)
1. The Right of Self-Determination
At common law, a competent individual’s right of self-determination gives him/her the right to decide what happens to his/her body. (See Grace Plaza of Great Neck v Elbaum, 82 NY2d 10, 15 [1993]; see generally Delio v Westchester County Med. Ctr., 129 AD2d 1 [2d Dept 1987].) This doctrine includes a person’s right to refuse even life-preserving medical treatment. (Id. at 22; Grace Plaza, 82 NY2d at 15.) “No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.” (Union Pac. Ry. Co. v Botsford, 141 US 250, 251 [1891].)
Since the right of self-determination can only be made by one who is competent to evaluate his/her own condition, a patient lacking in this capacity is said to have forfeited this right of self-determination unless, while competent, the patient expressed his/her preferences. (See Matter of Westchester County Med. Ctr. [Hall], 72 NY2d at 530.)
In such a case, this subjective test requires that someone acting on the incompetent’s behalf establish the incompetent’s preferences by clear and convincing evidence. (Matter of Westchester County Med. Ctr. [Hall], 72 NY2d at 528-529; Matter of Storar, 52 NY2d at 378-379.) Thus, a dying patient’s right of self-determination outweighs the rights of the patient’s family, physicians, or other care providers to base a treatment decision on their individual interests or ethical imperatives. (See id. at 377.)
In 1981, the Court of Appeals jointly heard two cases concerning whether a parent or other interested third party could make a decision to withhold treatment for an incompetent child or friend. (Matter of Eichner v Dillon and Matter of Storar, 52 NY2d 363 [1981].) In Eichner, Father Eichner, as guardian for Brother Fox, a terminally ill 83 year old in a persistent vegetative state, sought to remove the mechanical ventilator. Before he became seriously ill, Brother Fox had stated that he would not want to have his life extended via extraordinary measures. The Court of Appeals ruled that the ventilator could *946 be removed because there was clear and convincing evidence of Brother Fox’s wishes. Accordingly, a competent adult’s (or an adult who clearly made her wishes known prior to becoming incapacitated) right to refuse treatment can prevail over the State’s parens patriae interests.
In Storar, the mother of a 52-year-old mentally retarded adult with terminal bladder cancer sought to discontinue blood transfusions which her son found disagreeable and resisted, but nonetheless would prolong his sentient life for three to six months. Because he was mentally retarded, Mr. Storar never had the mental capacity to state whether or not he would wish to have his life extended should he become gravely ill. The Court found that “the evidence convincingly shows that the transfusions did not involve excessive pain and that without them his mental and physical abilities would not be maintained at the usual level.” (Id. at 381.) The Court thus held that, in such case, the parent’s decision to decline treatment must yield to the “State’s interests, as parens patriae, in protecting the health and welfare of the child.” (Id.) The Court indicated that given that “particularly important personal interests are at stake, clear and convincing evidence should be required.” (Id. at 379.)
2. The Best Interest Test
In cases such as the one before the court, where a terminally ill patient has never been competent to express his/her wishes regarding medical treatment (therefore precluding the availability of clear and convincing evidence of a patient’s wishes), the law in New York is unsettled. It has been held that, where there is no compelling evidence of the incompetent’s wishes, the court must determine whether withdrawal of life support will serve the patient’s “best interest.” (Matter of Beth Israel Med. Ctr., 136 Misc 2d 931, 939 [Sup Ct, NY County 1987].)
In determining the patient’s “best interest,” at minimum, there should be evidence that the burdens of prolonged life outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life. (See id. at 938.) It is clear, however, that medical treatment may not be withheld from an incompetent simply because a third party believes that the incompetent’s quality or prognosis is less than optimal. (See e.g. Matter of Westchester County Med. Ctr. [Hall], 72 NY2d 517, 533 [1988] [authorizing hospital, despite daughters’ wishes, to insert feeding tube into a 77-year-old woman who was not in a vegetative *947 state, but was awake and conscious, could feel pain and respond to simple questions]; Matter of O’Brien, 135 Misc 2d 1076, 1078 [NY County 1986] [refusing to authorize removal of feeding tube for elderly incompetent who could understand some questions and respond with an affirmative squeeze of the hand].)
In Matter of Storar, the Court of Appeals determined that because the necessary blood transfusions did not involve excessive pain (even though the incompetent patient expressed a dislike for them), and that without them, his mental and physical abilities would not be maintained at the same level, the trial court should have granted the application for permission to continue the transfusions, over the objections of the patient’s mother. (Id. at 381-382.) “However, the fact that the [C]ourt [of Appeals] did not permit the mother to withhold transfusions should not be interpreted as foreclosing the possibility of humane actions through surrogate decision-making which may involve withholding life-prolonging treatment for persons who never spoke on the issue.” (Matter of Beth Israel at 937.) Further, complete foreclosure is not necessarily what the Court of Appeals intended as it was careful to state that “any guidance we may provide for future cases is necessarily limited * * * Our role * * * is limited to resolving the issues raised by facts presented in particular cases.” (Matter of Storar at 370; see also Matter of Beth Israel at 937.)
Here, unlike the 52-year-old adult incompetent patient John Storar, it is undisputed that the infant patient AB would not derive any benefit from having her life prolonged through mechanical ventilation because of her persistent vegetative state. Indeed, there is irrefutable evidence that AB has sustained massive irreversible brain damage, confirmed by diagnostic tests, and remains in a persistent state of unconsciousness. Further, unlike in Storar, where the physicians recommended treatment which was refused by the mother, in the case of AB, all treating physicians, the hospital, AB’s parents, family and the guardian ad litem, concur that the continued maintenance of the ventilator is not in AB’s best interest.
Further, it is undisputed that AB has no quality of life to preserve. Unlike John Storar, AB does not have a sapient existence; she cannot play, talk, or feel physical sensation. In fact, Professor Nancy Dubler, a bioethicist at Albert Einstein College of Medicine and New York University Law School, concluded, after an intensive review of this case, that the main *948 tenance of the mechanical respirator in AB’s case only “imposes a medical intervention,” without providing any concomitant “health benefit” to AB.
New York courts have held that the removal of life-sustaining treatment where, as in AB’s case, the incompetent “has no quality of life whatsoever” is permissible. (See Matter of Christopher, 177 Misc 2d 352, 356 [Sup Ct, Queens County 1998]; Matter of Beth Israel Med. Ctr., 136 Misc 2d 931 [Sup Ct, NY County 1987].)
In Christopher, Parkway Hospital sought to insert a feeding tube into the stomach of a 79-year-old woman diagnosed with Alzheimer’s disease. Her son opposed the application stating that his mother would not have wished it. While the mother was not in a persistent vegetative state or a coma, the court noted that “for all intents and purposes, she is brain-dead, unable to walk, incontinent and in pain.” (Matter of Christopher, 177 Misc 2d at 356.) Stating that such decisions would best be left between medical personnel and family members, the court held that the hospital’s application to insert the feeding tube would be against her wishes, futile, and unnecessary. (Id.)
Similarly, in Matter of Beth Israel Med. Ctr., a hospital sought authorization to perform an emergency amputation of the leg of a 74-year-old partially paralyzed and aphasic woman, Sadie Weinstein. (136 Misc 2d at 932.) The surgery was opposed by Ms. Weinstein’s sister. As a result of a second stroke, Ms. Weinstein was bed bound, could not speak, and had little cognitive function. She was fed through a nasogastric tube. A neurologist determined that her condition was irreversible and would only decline. Her physical responses were haphazard. The court noted that while Ms. Weinstein was not completely comatose, she was “more mentally and physically debilitated than the patient in Storar.” (Id. at 942.) The court determined that Ms. Weinstein “should be permitted to die with dignity” because the proposed surgery would “at best, unnecessarily prolong the natural process of her dying” and that there was “no human or humane benefit to be gained” from its performance. (Id.)
B. The Law in Other Jurisdictions
The highest courts in other jurisdictions have favored putting decisions such as the one which is before this court in the hands of loving and caring parents of the infant, without the need for judicial intervention. (See In re L.H.R., 253 Ga 439, 446, 321 SE2d 716, 723 [1984] [holding that the decision to *949 forgo or terminate life support measures where the infant is terminally ill with no hope of recovery and in a chronic vegetative state is “simply a decision that the dying process will not be artificially extended” and that the “decision can be made only by the surrogate of the infant”]; In re Guardianship of Barry, 445 So 2d 365 [Fla 1984] [holding that it is the right and obligation of the parents of a terminally ill child who is wholly lacking in cognitive brain functioning, completely unaware of his surroundings and with no hope of development of any awareness to exercise the responsibility and prerogative of making an informed determination as to whether extraordinary life-prolonging measures should be continued]; Matter of Quinlan, 70 NJ 10, 355 A2d 647 [1976] [holding that a trustworthy and loving parent could assert an infant patient’s constitutional right to privacy to support a request, in the patient’s name, to withdraw life-prolonging treatment].)
In L.H.R., the Supreme Court of Georgia was called upon to determine who may make treatment decisions, and whether judicial intervention is required in cases where the diagnosis is made that the infant is in a persistent vegetative state with no reasonable possibility of attaining cognitive function. (L.H.R., 253 Ga at 439, 321 SE2d at 718.) Like the case at bar, the infant L.H.R. suffered a “medical catastrophe.” (Id.) It occurred 15 days after her normal birth and she remained hospitalized for the next several months during which a neurologist determined that the infant was in a “chronic vegetative state” with the “absence of cognitive function.” (Id.) The physicians estimated that approximately 85% to 90% of her brain tissue had been destroyed and her condition was described as “irreversible” with no hope of recovery. (Id.)
Similar to the case at bar, the physicians, parents, the guardian ad litem, and the hospital’s Infant Care Review Committee all agreed that she should be removed from life support. (Id.) The hospital filed a petition for declaratory relief. The trial court enjoined the hospital and physicians from interfering with the wishes of the infant’s parents and guardian to withdraw the life-prolonging measures. After obtaining a court order, the life support systems were removed and the infant died within 30 minutes. (Id.)
The Georgia Supreme Court limited its holding to cases like the one at bar which concern terminating treatment of hopelessly or terminally ill patients in a chronic vegetative state, for whom there is no possibility of attaining (or regaining) cognitive function. The court determined that “the decision *950 whether to end the dying process is a personal decision for family members or those who bear a legal responsibility for the patient,” and not the judiciary. (253 Ga at 446, 321 SE2d at 723.) The court further stated that “the courts remain open to assist if there is disagreement between the decisionmakers or question of abuse.” (Id. at 447, at 723.)
The court recognized the role of the family in such decisions:
“In any discussion of who will exercise the incompetent patient’s constitutional right to refuse treatment, we must recognize the importance of the family in our society. This recognition is particularly crucial when the patient is a child * * * The right of the parent to speak for the minor child is so imbedded in our tradition and common law that it has been suggested that the constitution requires that the state respect the parent’s decision in some areas* * * We now hold that this right [a competent adult’s right to instruct a physician to withhold or withdraw life-sustaining procedures] rises to the level of a constitutional right which is not lost because of the incompetence or youth of the patient * * * We conclude that the right to refuse treatment or indeed to terminate treatment may be exercised by the parents or legal guardian of the infant after diagnosis that the infant is terminally ill with no hope of recovery and that the infant exists in a chronic vegetative state with no reasonable possibility of attaining cognitive function * * *.” (L.H.R., 253 Ga at 445-447, 321 SE2d at 722-723 [citations omitted].)
Similarly, in In re Barry, where the parents sought to discontinue life support systems for their 10-month-old son who was in a persistent vegetative state, the Florida District Court of Appeals reasoned that “the constitutional right of privacy would be an empty right if one who is incompetent were not granted the right of a competent counterpart to exercise his rights.” (445 So 2d at 370.) After the parents were appointed as legal guardians of their infant son, Andrew, they petitioned the trial court for approval to terminate the use of his life support system. Andrew was in a chronic permanent “vegetative coma,” did not have any cognitive brain function, and was terminally ill (id.). The petition was accompanied by three supporting physicians’ affidavits.
With regard to whether the petitioners could exercise the right to privacy on behalf of their child Andrew, even in the absence of evidence of Andrew’s intent, the court held that
*951 “in the case of a child who has not reached maturity, it is the parents and their medical advisors who generally must make these decisions. And, where judicial intervention becomes necessary or desirable, the court must be guided primarily by the judgment of the parents who are responsible for their child’s well-being, provided, of course, that their judgment is supported by competent medical evidence.” (445 So 2d at 371.)
Finally, the court declared prospectively that prior judicial authority or review is not required because “decisions of this character have traditionally been made within the privacy of the family relationship based on competent medical advice and consultation by the family with their religious advisors, if that be their persuasion.” {Id. at 371.) The court stated:
“[W]here, as here, the question concerns a young child, we do not think the parents must always qualify as legal guardians and seek judicial sanctions to discontinue these extraordinary measures. A decision by parents supported by competent medical advice that their young child suffers from a permanent, incurable and irreversible physical or mental defect likely to soon result in the child’s death should ordinarily be sufficient without court approval.” (445 So 2d at 372.)
In Matter of Quinlan, the seminal case on this issue, the New Jersey Supreme Court concluded that Karen Ann Quinlan had a right, grounded in the right of privacy protected by the US Constitution, to refuse unwanted medical care. (70 NJ at 41, 355 A2d at 664.) Karen fell into a persistent vegetative state after suffering brain damage of an unknown origin. Karen’s father petitioned the trial court for an order to appoint him as Karen’s guardian and specifically requested authority to disconnect a respirator that the physicians believed necessary for her survival. The trial court denied the father’s petition holding that there was inconclusive proof of Karen’s preferences for treatment.
The New Jersey Supreme Court reversed and granted the father’s petition. The court entertained no doubt “that if Karen were herself miraculously lucid for an interval * * * and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death.” (70 NJ at 39, 355 A2d at 663.) Thus, the court ruled that Karen should not lose *952 her right simply because her condition prevents her exercise of such choice.
C. Surrogate’s Court Procedure Act
Like many other jurisdictions, New York’s law involving the right of a patient, or a surrogate, to decline medical treatment has evolved over the last decade. In this regard, the New York Legislature has enacted certain statutes which have gone far toward solving the problems presented by these types of cases.
Most recently, the Legislature enacted a new law which grants to guardians of individuals suffering from mental retardation the authority to withhold life-prolonging treatment. This authorization is derived from the new Health Care Decisions Act for Persons with Mental Retardation (HCDA or the act), which went into effect on March 16, 2003. While this statute specifically addresses guardians of individuals with mental retardation appointed under article 17-A of the Surrogate’s Court Procedure Act, it also reflects an evolving consensus in this state that the law must better allow health care practitioners, patients and their families to make decisions in the best interest of their children when faced with tragic circumstances.[3]
While the statute is not directly applicable to AB’s situation in that it is limited to mentally retarded persons, the analytical process established by the Legislature for surrogate decision making is an appropriate framework for analysis in the instant case. In fact, according to the medical testimony presented to this court, AB’s condition is far more profound than that of a person who is mentally retarded, as she totally lacks *953 the ability to interact with her environment, unlike someone who is mentally retarded.[4]
When it appears to the satisfaction of a court that a person is mentally retarded, section 1750 and newly enacted section 1750-b of the SCPA authorize the appointment of a guardian to act on behalf of a mentally retarded person on the certification of two doctors that the patient is mentally retarded and is incapable of making health care decisions. A guardian so appointed “shall have the authority to make any and all health care decisions on behalf of the mentally retarded person * * * that such person could make if such person had capacity” including “decisions to withhold or withdraw life-sustaining treatment.” (SCPA 1750-b [1].)
The guardian is to base all advocacy and health care decision making solely and exclusively on the best interest of the mentally retarded person and, when reasonably known or ascertainable with reasonable diligence, on the mentally retarded person’s wishes. (SCPA 1750-b [2] [a].) Pursuant to the statute, the assessment of “best interest” must include the following considerations: “(i) the dignity and uniqueness of every person; (ii) the preservation, improvement or restoration of the mentally retarded person’s health; (iii) the relief of the mentally retarded person’s suffering by means of palliative care and pain management; (iv) the unique nature of artificially provided nutrition or hydration, and the effect it may have on the mentally retarded person; and (v) the entire medical condition of the person.” (SCPA 1750-b [2] [b].)
In this case, the guidelines established by the Health Care Decisions Act for Persons with Mental Retardation, by analogy, have been exceeded. The diagnosis requirement by two physicians articulated by the act has been exceeded in that numerous physicians, including treating physicians and independent experts, have certified that AB is in a persistent vegetative state from which there is no possibility of recovery. (See SCPA 1750.) Additionally, given that AB is 3V2 years old and is permanently unconscious, there is no question that she *954 lacks capacity to make health care decisions for herself and her wishes are not “reasonably known or ascertainable.” (See SCPA 1750-b [2] [a].)
Further, the scope of the authority conveyed on the guardian by the act is similar to the authority sought by the mother here — to make all health care decisions for her child — including the decision to withhold or withdraw life-sustaining equipment.
In addition, the decision-making analysis employed by the mother, with the guidance of AB’s treating physicians and Kings County Hospital Center’s Ethics Committee, in arriving at the conclusion that the withholding of mechanical ventilation is medically and ethically appropriate under the existing circumstances, is similar to the “best interest” standard articulated in the act. (See SCPA 1750-b [2] [b].) CD testified at the April 9, 2003 hearing that the essence of her child’s uniqueness has been permanently lost, as her child is a mere unconscious “shell” of her former self. Additionally, Dr. Goldman concluded that AB has “no possibility of recovery” and that her care now consists of managing medical catastrophes which will inevitably occur and ultimately lead to her death. The relief of AB’s suffering is not a factor because, as Professor Dubler concluded, the mechanical ventilator “will do nothing but maintain her in a state beyond comfort and care from which she will not recover.” In addition, Dr. Goldman testified that “suffering and joy or pleasure are permanently beyond this child’s capacity.” With respect to the entire medical condition of AB, sadly, there is no question that AB has no chance of recovery.[5]
In fact, it is uncontested by all of those involved in this case, including three qualified physicians and the guardian, that CD is acting in the best interest of her daughter. The record clearly establishes that she is a loving mother who has no financial or other interest in making the decision to withdraw life support except to ensure that her daughter dies peacefully.
The SCPA further requires that the health care decision not be subjected to discrimination based upon disability or influenced by financial factors of the guardian and should be *955 based upon full and complete medical information. (See SCPA 1750-b [2] [c]; [3].) Here, this has been satisfied in that there is no allegation of disability-based discrimination and the mother has no financial incentive to decide to withdraw the mechanical ventilator since AB’s medical care is covered by insurance. Further, there have been numerous regular meetings with the treating physicians, family, and members of the hospital’s Ethics Committee, and thus CD is fully informed.
Where the health care decision to be made by the guardian concerns terminating life-sustaining treatment, the act provides that certain additional steps be followed. (See SCPA 1750-b [4].) As explained below, each of these additional requirements have been satisfied in the case of AB. The requirement that there be a diagnosis, confirmed by two physicians with a reasonable degree of medical certainty, that the patient has one of the following conditions has been met: (A) a terminal medical condition; (B) permanent unconsciousness; or (C) an irreversible condition which will continue indefinitely. (See SCPA 1750-b [4] [b] [i].) As testified to by Dr. Goldman, the child AB has met all three conditions in that she has a “terminal condition” and is in a “state of permanent unconsciousness” with “no possibility * * * that this child can ever recover from the vegetative state.” Independent confirmation that AB is permanently unconscious, and that this state is irreversible and will continue indefinitely, has been established by two other physicians, Dr. Fleischman and Dr. Laníos.
The section which requires a finding by two physicians that the life-sustaining treatment imposes an extraordinary burden on the patient in light of his/her medical condition and expected outcome of the treatment has also been met. (See SCPA 1750-b [4] [b] [ii].) Dr. Goldman testified that the mechanical ventilator is essentially prolonging AB’s dying process without providing her any medical benefit. He further stated that if kept on the ventilator, in all likelihood, the child would experience one or several catastrophic episodes typically involving the lungs; the introduction of bacteria through the tubing into the lung would likely create a severe bacterial or chemical pneumonia which would lead to a reaction that would make it impossible to provide oxygen and remove carbon dioxide, leading to a deprivation of oxygen to the vital organs. Additionally, in support of the determination to remove AB’s mechanical ventilator, Dr. Fleischman states that “technical intervention to suspend AB *956 in her present condition is unsupported by the medical and ethical standards which our society has widely embraced.”[6]
The requirement that the guardian, in this case AB’s mother, express the decision to withdraw life-sustaining equipment in writing or orally has been met. (See SCPA 1750-b [4] [c].) In addition, SCPA 1750-b (4) (d), which requires this request to be entered into the patient’s chart, has also been satisfied.[7]
Accordingly, the court finds that AB’s case exceeds the standards set forth in the Health Care Decisions Act for Persons with Mental Retardation for authorizing a guardian, in this case the mother, to make the decision to withhold or withdraw life-sustaining treatment.
D. American Medical Association Cuidelines
The decision to withdraw life-prolonging treatment from a patient in a persistent vegetative state has long been recognized in the medical community to be appropriate. (See Council on Ethical and Judicial Affairs, American Medical Association, Withholding or Withdrawing Life Prolonging Medical Treatment, Mar. 15, 1986.) Guidelines have been proposed by the American Medical Association (AMA) in formulating an opinion concerning their ethical analysis of treatment decisions for seriously ill newborns. Although not expressly applicable as it concerns only newborns, the AMA guidelines provide another analytical framework in this case, similar to the newly amended and enacted sections of the SCPA discussed previously. Specifically, the AMA proposes a best interest standard which:
“requires a weighing of the benefits and burdens of treatment options including nontreatment as objectively as possible. Factors that should be considered when making decisions about life-sustaining or life-saving treatment for a seriously ill newborn include: (1) the chance the therapy will succeed, (2) the risks involved with treatment and nontreatment, (3) the degree to which the therapy if successful will extend life, (4) the pain and discomfort associated with the therapy and (5) the anticipated quality of life for the newborn with and *957 without treatment.” (American Medical Association, Council on Ethical and Judicial Affairs[8] Op 2:215, Treatment Decisions for Seriously 111 Newborns [June 1992] [1992 Report].)
In the 1992 Report, the Council proposed that the patient’s family should be given the authority to make treatment decisions:
“In the case of seriously ill newborns, the parents should be responsible for making treatment decisions for their child based on the child’s best interest. Due to the love that parents have for their children, they are most likely to make decisions that promote their children’s best interest. Parents are more likely to treat if their child was a person rather than a symbol for a cause. In addition, society has recognized the importance of family autonomy and privacy from outside intervention.” (Id.)
Furthermore, when an infant suffers extreme neurological damage, such as when an infant is in a persistent vegetative state like AB, “and is consequently not capable of experiencing either suffering or joy, a decision may be made to withhold or withdraw life-sustaining treatment upon the parents’ request.”[9] (Id.)
Lastly, as part of the AMA’s recommendations, “physicians must provide full information to parents of seriously ill newborns regarding the nature of treatments, therapeutic options and expected prognosis with and without therapy, so that parents can make informed decisions for their children about life-sustaining treatment.” (Id.)
Applying such factors to the case of AB, the decision to withhold mechanical ventilation satisfies the best interest standard articulated by the AMA. AB is incapable and will permanently remain incapable of experiencing suffering or joy or interacting meaningfully with her environment because of her PVS. Additionally, AB is subject to many physical intrusions including catheterizations, feeding tubes, IV’s and mechanical ventilation on a daily basis and if kept on a mechanical ventilator, *958 she faces increasing physical invasions to her body, and will undoubtedly suffer more infections and a deterioration of her condition with no benefit. In fact, the mechanical ventilator is merely prolonging her eventual death. Thus, AB’s case meets or exceeds the standards set forth by the AMA Council on Ethics and Judicial Affairs Ethical Opinion concerning the decision to withhold or withdraw life-sustaining treatment.
E, Parental Rights and Public Health Law § 2504 (2)
CD’s authority to exercise her judgment as the parent of AB is also grounded on traditional parental values and responsibilities. Every parent has a “fundamental right” to rear his or her own child. (Matter of Hofbauer, 47 NY2d 648, 655 [1979], citing Matter of Bennett v Jeffreys, 40 NY2d 543, 546 [1976]; Quilloin v Walcott, 434 US 246, 255 [1978], reh denied 435 US 918 [1978].) While this right is not absolute, “great deference must be accorded a parent’s choice as to the mode of medical treatment to be undertaken and the physician selected to administer the same.” (Hofbauer at 655.) In fact, the “filial bond is one of the strongest * * * and most inviolable of all relationships.” (Id., citing Matter of Corey L. v Martin L., 45 NY2d 383, 392 [1978]; see also Weber v Stony Brook Hosp., 60 NY2d 208 [1983], cert denied 464 US 1026 [1983] [providing that caring and nurturing for a sick child is a parent’s “most private and most precious responsibility”].) “Obviously, for all practical purposes, the average parent must rely upon the recommendations and competency of the attending physician since the physician is both trained and in the best position to evaluate the medical needs of the child.” (Matter of Hofbauer, 47 NY2d at 655-656.)
Furthermore, pursuant to New York State Public Health Law § 2504, parents have the right to provide effective consent concerning medical service for their children. Public Health Law § 2504 (2) states: “Any person who has been married or who has borne a child may give effective consent for medical, dental, health and hospital service for his or her child.”
Under this statute, courts have held that a parent can compel her child to undergo medical treatment, even when it is against the vigorous objections of the child, because children are considered to be “lacking in judgment” as their “normal condition is that of incompetency.” (See e.g., Matter of Thomas B., 152 Misc 2d 96, 99 [Fam Ct, Cattaraugus County 1991] [a child who was phobic of needles was required to undergo biopsy of tumor].)
*959 Moreover, parents have the right to determine or refuse treatment for their children even where, unlike here, the parents’ decision is contrary to their child’s treating physician’s medical opinion.[10] (See Matter of Hofbauer, 47 NY2d 648 [1979].) In Matter of Hofbauer, the New York Court of Appeals upheld the parents’ right to reject the conventional modes of radiation and chemotherapy and opt to use alternative nutritional therapy for their child diagnosed with terminal Hodgkin’s disease. (Id. at 657-658; Matter of Matthews [Mental Hygiene Legal Servs.], 225 AD2d 142 [3d Dept 1996] [upholding that parents’ authority to refuse placement of feeding tube in lieu of continued oral feeding of malnourished mentally retarded adult son was reasonable where supported by treating physician]; Matter of Felicia D., 263 AD2d 399 [1st Dept 1999] [upholding mother’s right to refuse to consent to child’s placement in residential mental health facility]; Alfonso v Fernandez, 195 AD2d 46, 52 [2d Dept 1993] [holding that, under Public Health Law § 2504 (2), parents have the right to consent to child’s participation in a voluntary condom distribution program at schools].)
In this case, AB is beyond choosing treatment modalities. She is in a persistent vegetative state. AB’s treating and independent pediatricians all agree that there is no hope for AB’s recovery. There is no treatment that CD can elect which will improve AB’s prognosis. The only “mode of treatment” that CD can select which she believes will ameliorate AB’s condition is the removal of the mechanical ventilator. AB’s treating physicians all concur with CD’s decision. Pursuant to Matter of Hofbauer and Public Health Law § 2504 (2), CD is authorized to make this choice for her daughter.[11] (47 NY2d at 655.)
III. Conclusion
It is unrefuted that AB has sustained massive irreversible brain damage and has no hope of recovery from her permanent state of unconsciousness, known as PVS. She is subject to many physical intrusions on a daily basis, including catheterizations, *960 feeding tubes, TV’s and mechanical ventilation, and is incapable of experiencing any physical or emotional pleasure. If kept on a mechanical ventilator, the child faces more physical invasions to her body, and she will undoubtedly suffer increasing infections and a deterioration of her condition with no benefit. It is clear to the court, as it is to AB’s mother, the treating physicians, independent physician experts and the guardian ad litem, that the extraordinary “life-prolonging” measures are merely prolonging AB’s death.
The court observes that it is readily apparent that CD is not making this decision lightly. All who have reviewed this case, including the treating physicians, independent medical experts, hospital’s medical ethics team and the court appointed guardian ad litem, concur that CD is a loving mother who is acting in the best interest of her child. She has consulted with AB’s doctors on a daily basis since the December 31, 2002 incident and was provided complete detailed information about AB’s condition and prognosis. She has met with the hospital’s Ethics Committee many times. In addition, CD has discussed her decision thoroughly with her family and it is supported by the father of the child. The mother’s decision is not rooted in financial reasons as her daughter’s care is covered by health insurance and there are no life insurance or other financial motivations prompting such decision.
Absent extraordinary circumstances such as incapacity, conflict of interest, or disagreement between parents, a parent of a minor child with an established diagnosis of persistent vegetative state should have the right to decide whether to terminate life support in the best interest of the child, without the necessity of judicial intervention. While the courts are always available to assist if there is a disagreement or question of abuse, the decision to end the dying process of a minor child is a personal decision for the parents, in consultation with the child’s medical providers, as they bear the legal, moral and ethical responsibility for their child. Both the HCDA and the AMA guidelines, by analogy, as well as Public Health Law § 2504 (2) and New York’s case law, fully support the proposition that CD, as mother and natural guardian of AB, is fully authorized to make a decision to withhold mechanical ventilation because it is in the best interest of her child.
Thus, this court holds that it is CD’s right, as a parent and natural guardian of AB, to exercise her responsibility and prerogative to make this decision to withhold extraordinary life-prolonging measures, with the assistance of treating *961 physicians. CD’s parental choice, made in the best interest of her child, to allow her daughter to pass away peacefully and with dignity are to be honored. This decision respects the values of family privacy without compromising a patient’s rights or overstepping the State’s legitimate interests.
Having sought judicial intervention, CD has proven by clear and convincing evidence that it is in the best interest of her child to remove the mechanical ventilator. As CD sought intervention, this court has employed the best interest standard, weighing whether the burdens of prolonged life outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the child may still be able to derive from life. (See Matter of Beth Israel Med. Ctr., 136 Misc 2d at 938.) In addition to the factors listed in SCPA 1750-b, the court has also employed the considerations listed in the AMA 1992 Report in determining that there is clear and convincing evidence that it is in the best interest of AB to remove the mechanical ventilator. In evaluating best interest, the court is also guided by the judgment of the parents.
Because AB will remain in a vegetative state, with no hope of any improvement or recovery, CD’s request that this court order HHC to honor CD’s good faith determination to terminate mechanical ventilation because it is in the best interest of her child is granted. There can be no state interest great enough to compel AB to remain subjected to this extraordinary life-sustaining measure. To do so would merely prolong the death of a terminally ill child, wholly lacking in cognitive brain functioning, completely unaware of her surroundings, and with no hope of ever regaining awareness, while subjecting her to daily physical intrusions including catheterizations, feeding tubes, IV’s and increasing infections.
Accordingly, having held a hearing over the course of two days and having heard the testimony of the mother CD, Dr. Gilbert M. Goldman, and the guardian ad litem and upon review of petitioner’s 1 (the medical records of the child) and petitioner’s 2 (the report of the guardian ad litem) and the other exhibits, and upon all the affirmations supporting the order to show cause which include those of Dr. Alan R. Fleischman, Dr. John Lantos, and Nancy Dubler, LLB, it is ordered that petitioner’s application is granted, to the extent that CD, mother of AB, is granted authority to consent to the removal of *962 mechanical ventilation for AB, a minor child; and it is further ordered that New York City Health and Hospitals Corporation honor CD’s wishes as mother and natural guardian to stop mechanical ventilation for her child AB.

. The court issued an oral decision and order on the record prior to the release of this decision which is incorporated herein. Given the tragic circumstances, this court did not want to prolong AB’s family’s agony by waiting until the written decision was finalized.

. For the purposes of this proceeding, the court granted petitioner’s application to use the name “CD” and “AB” for her child.

. The purpose of the new law is to “explicitly provide guardians of mentally retarded persons with the authority to make health care decisions for such persons, including decisions regarding life-sustaining treatment under certain circumstances.” (H.R. S 4622B, New York State Senate Introducer’s Mem in Support of S 4622B.) As was observed: “Recent case law has disallowed that authority [of guardians], particularly in the area of life-sustaining decisions * * * [The] lack of clear authority regarding provision of life-sustaining treatment has, on occasion, obstructed the guardian’s role or, worse, created catastrophic obstacles to relieving desperate health care emergencies.” (Id.) This new law “provides a carefully controlled legal and medical process for withholding or withdrawing life-sustaining treatment while safeguarding the rights, liberties and best interests of persons with mental retardation.” (H.R. A 8466-b, New York Assembly Mem in Support of A 8466-b.) As was recognized on the floor during the vote for the new law: “[Sfimilar legislation is also urgently needed dealing with health care decision-making for the rest of New Yorkers * * *.” (2002 Assembly debate transcripts, ch 500, at 103, 108 [June 20, 2002] [statement of Assemblyman Richard Gottfried].)

. At the outset of this analysis, it is important to distinguish between the condition of persistent vegetative state and mental retardation. At the April 9, 2003 hearing before this court, Dr. Goldstein testified that someone in a persistent vegetative state is at the “very far end of a spectrum” of neurological functioning. At the opposite end of this spectrum is a fully functioning, conscious person. He further stated that mental retardation “is probably closer to normal function” than a person in a PVS, because a retarded person has consciousness and “is capable of interacting with the environment.”

. The withdrawal of artificial nutrition is not an issue in this case. (SCPA 1750-b [2] [b] [iv].)

. SCPA 1750-b (4) (b) (iii), discussing the issues of withdrawal of hydration and nutrition, does not apply in this case.

. The remainder of this statute does not apply to this case because it concerns notice to the patient and how to handle objections to the withdrawal of treatment, of which, there are none.

. The Council on Ethical and Judicial Affairs is charged with maintaining and updating the AMA Code of Medical Ethics, which is widely considered the most comprehensive ethics guide for physicians.

. Although AB is 3V2 years of age, not a newborn, this ethical opinion is persuasive because she, like a newborn, was never competent to express her opinion about life-sustaining treatments. Dr. Goldman has noted that this ethical opinion is appropriately applied in this case.

. Indeed, parents have the right to sign “do not resuscitate orders” for their minor children who are, as here, permanently unconscious. (See Public Health Law § 2967 [3].)

. A 1989 survey of case law throughout the United States concerning the withdrawal of life support for children who are in a persistent vegetative state found numerous cases where courts permitted the withdrawal of life support for such children and none where a court ordered the continuation of ventilator support. (J.D. Laníos et al., The Linares Affair, 17 L, Med & Health Care 308 [1989].)