OPINION OF THE COURT
Eugene E. Peckham, J.
The matter before the court is a petition for the appointment of a temporary guardian of Baby Boy W. with authority to make medical decisions for W pursuant to SCPA 1750-b. That section was just added to article 17-A by the Legislature, effective March 16, 2003 (L 2002, ch 500, § 3). W. was born on November 12, 2003 and so was about one month old when the petition was filed. The petitioner is the infant’s maternal grandmother as permitted by SCPA 1751. The child’s mother died from a seizure and the baby was born by an emergency Caesarian. The mother’s husband had been separated from W.’s mother for three years, denies that he is W.’s father and has defaulted in appearing in response to a citation in this proceeding. Another individual who may be the putative father was also served with the citation and has also defaulted in appearing in this proceeding.
Attached to the petition are the affirmations of two physicians as required by SCPA article 17-A. Dr. Halpert is board certified in pediatric neurology and Dr. Vileisis is board certified in pediatrics and neonatalogy. The affirmations both state that W. is mentally retarded due to encephalopathy. Both doctors also state the baby has nonreactive pupils, no gag reflex, cannot swallow, posturing with pain and gasping respirations of 5 to 13 breaths per minute. Both affirmations state that Baby W. is not capable of making health care decisions.
A guardian ad litem was appointed for W. and a hearing held at the hospital at which the grandmother, Dr. Vileisis, Dr. Dave, the director for 15 years of the neonatalogy intensive care unit *658 at the hospital, and the guardian ad litem appeared and testified. Also appearing pro se was the maternal grandfather. Both doctors at the hearing testified the baby is on a ventilator to breathe and has a feeding tube inserted. They also both testified the baby is severely mentally retarded, that his condition is terminal and irreversible, and that the treatment being provided is an extraordinary burden to Baby W. Dr. Vileisis also testified the interventions necessary to keep Baby W alive are painful.
The maternal grandmother testified she is a registered nurse and had worked in New York City hospitals in obstetric-gynecology and pediatrics. From her visits to the baby and her experience as a nurse, she testified to the baby’s suffering. When asked if she could act in the baby’s best interests she said, “I love him enough to let him go.”
The guardian’s report contains the following recommendation:
“W.’s condition requires both quick and exceptional decision making authority. As a result, I recommend that the Petitioner be appointed W.’s temporary guardian immediately. I also recommend that the Petitioner, as temporary guardian, have all those powers which would be granted to a permanent guardian, including without limitation the authority to make all health care decisions including those concerning withdrawing or withholding life sustaining treatment.”
At the hearing, the court issued a decision and order from the bench appointing the maternal grandmother as temporary guardian of W. with powers to make health care decisions, including withholding or withdrawing life sustaining treatments. This order was confirmed by written decree on December 22, 2003. This written decision sets forth in detail the court’s reasoning for that decision. Unfortunately, Baby W. has died subsequent to the hearing and order.
It has been the law of New York that a competent adult has the right to control or refuse his own medical treatment, even life sustaining treatment. Judge Cardozo stated the law of New York as follows: “Every human being of adult years and sound mind has a right to determine what shall be done with his own body.” (Schloendorff v Society of N.Y. Hosp., 211 NY 125, 129 [1914].) Further, “[t]he basic right of a patient to control the course of his medical treatment has been recognized by the Legislature (see Public Health Law, §§ 2504, 2805-d; CPLR 4401-a)” (Matter of Storar, 52 NY2d 363, 376 [1981]).
*659 The more difficult problem is whether a surrogate decision maker can make such decisions on behalf of an infant or an incompetent person. The Court of Appeals has held that where a person was once competent, but has become incompetent due to coma or dementia, that such decisions can be made for the now incompetent person only if there is “[c]lear and convincing” evidence of the person’s wish “to terminate life sustaining procedures.” (Matter of Storar, supra at 379; Matter of Westchester County Med. Ctr. [O’Connor], 72 NY2d 517 [1988]; Cruzan v Director, Mo. Dept. of Health, 497 US 261 [1990].)
However, Storar involved a 52-year-old profoundly retarded man who had never been competent. The Court held that his mother’s request to terminate blood transfusions that were necessary to sustain his life must be denied. Since Storar had never been competent, there was no way to produce any evidence of what his wishes would be in regard to his medical treatment if he were competent.
The Supreme Court’s essential holding in Cruzan was that the State of Missouri could use “a clear and convincing evidence standard in proceedings where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state.” (Cruzan, supra at 284.) Thus it is for each state to determine the standards and procedures to be followed regarding withdrawal of life sustaining treatment for incompetents. Perhaps foreseeing this the Court of Appeals said in Storar: “If it is desirable to enlarge the role of the courts in cases involving discontinuance of life sustaining treatment for incompetents by establishing ... a mandatory procedure of successive approvals by physicians, hospital personnel, relatives and the courts, the change should come from the Legislature.” (Storar, supra at 382-383.)
The Legislature has now accepted the Court’s suggestion and adopted SCPA 1750 and 1750-b as amendments to the procedure for the appointment of guardians for mentally retarded persons under article 17-A. The questions thus presented are: (1) Do the amendments to article 17-A comply with the due process and equal protection requirements of the Fourteenth Amendment and the similar provisions in article I of the New York Constitution? (2) Do the facts of this case meet the requirements of the statute for the appointment of a guardian with power to make medical decisions for Baby W., including the withdrawal of life sustaining treatment?
The Supreme Court has held that it is permissible for a state to adopt separate and distinct procedures for the mentally *660 retarded as long as such procedures are “rationally related” to a legitimate governmental purpose. (Cleburne v Cleburne Living Ctr., 473 US 432 [1985]; Heller v Doe, 509 US 312 [1993].)
The Sponsor’s Memorandum of Support for the amendments to SCPA 1750 and 1750-b states: “The purpose of this bill is to explicitly provide guardians of mentally retarded persons with the authority to make health care decisions for such persons, including decisions regarding life sustaining treatment under certain circumstances.” (2002 NY Legis Ann, at 279.) As the Courts have indicated in Cruzan and Storar, it is a proper purpose for the Legislature to establish procedures for health care decision making for the incompetent and mentally retarded. The mentally retarded citizen can be tréated as a separate class for that purpose without violating their rights to equal protection of the laws. As the Supreme Court has said:
“Such legislation thus singling out the retarded for special treatment reflects the real and undeniable differences between the retarded and others. That a civilized and decent society expects and approves such legislation indicates that governmental consideration of those differences in the vast majority of situations is not only legitimate but also desirable.” (Cleburne, supra at 444.)
Also, the Court of Appeals has said the State under its parens patriae power has an interest “in providing care to its citizens who are unable to care for themselves because of mental illness.” (Matter of K.L., 1 NY3d 362, 371 [2004].)
Turning to the question of whether the new statute complies with the due process requirements of the Constitution it has been said: “The essential guarantee of the due process clause is that of fairness. The procedure must be fundamentally fair to the individual in the resolution of the factual and legal basis for government actions which deprive him of life, liberty or property.” (3 Rotunda and Nowak, Treatise on Constitutional Law: Substance and Procedure § 17.8, at 100 [3d ed].)
In order to determine the fairness of the procedure for appointing a guardian with authority to make health care decisions for the mentally retarded person, it is necessary to review the procedure provided in the statute. First the statute requires a petition accompanied by certificates from a physician and psychologist or two physicians that the respondent is mentally retarded. Under the 2002 amendment to SCPA 1750 (2), the certificates must now include a specific determination “as to *661 whether the mentally retarded person has the capacity to make health care decisions.” Thereafter, the court must hold a hearing, except the hearing can be dispensed with if the petition is either made by or consented to by the parents of the mentally retarded person.
The basic protection for the alleged retarded person is provided by the certificates of two professionals that the person is retarded. In Youngberg v Romeo (457 US 307 [1982]), involving the constitutional rights of mentally retarded persons who were institutionalized, the Supreme Court held: “In determining whether the State has met its obligations in these respects, decisions made by the appropriate professionals are entitled to a presumption of correctness.” (Youngberg v Romeo, supra at 324.)
Thus the certification by two physicians, or a physician and psychologist, “at least one of whom is familiar with or has professional knowledge in the care and treatment of persons with mental retardation” (SCPA 1750 [1]), is deemed to be correct.
As the Supreme Court has also recognized, “By the time the person reaches 18 years of age the documentation and other evidence of the condition have been accumulated for years.” (Heller v Doe, supra at 322.) The fact that the statute permits a hearing to be dispensed with if the parents are petitioners could be considered a denial of equal protection to some retarded persons. However, the Supreme Court has held that a hearing is not required in all cases. (Ingraham v Wright, 430 US 651 [1977].) Additionally, parents have a special relationship to their children. For example, until age 18 they can consent to all medical treatment. (Public Health Law § 2504 [2].) Again, the Supreme Court has noted that close relatives and guardians “likely have intimate knowledge of a mentally retarded person’s abilities and experiences.” (Heller v Doe, supra at 329.)
The purpose of the statute is to protect retarded persons by providing them with a guardian. In light of parents’ special relationship to the child, and the presumption of correctness of the two professionals’ certificates, it is not irrational to permit the court to dispense with a hearing where the parents are the petitioners or consent. Further, the Court of Appeals has just recognized that physicians or psychologists are better situated to determine whether or not a person has a mental condition than the court. (Matter of K.L., supra.) And the Supreme Court has held “[a] statutory classification fails rational-basis review *662 only when it ‘ “rests on grounds wholly irrelevant to the achievement of the State’s objective.” (Heller v Doe, supra at 324.) Such is not the case with the provisions of SCPA 1750-b.
But the real change brought about by the 2002 amendments is to make it explicit that 17-A guardians have the authority to make medical decisions for their wards. Even more significant is the power to authorize withdrawal:of life sustaining treatment.
Again the basic protection for the retarded person is the certificates of two doctors or a doctor and a psychologist. The statute also sets forth that all health care decisions are to be made solely and exclusively in the best interests of the retarded person. (SCPA 1750-b [2].)
For decisions to withhold or withdraw life sustaining treatment, a series of further steps is required as outlined below:
1. The guardian expresses a decision based on the best interests of the retarded person and, if known, the wishes of the retarded person, either
(a) in writing, witnessed by one person and delivered to the attending physician, or
(b) orally to the attending physician and one other person.
An assessment of best interests shall include:
(1) the dignity and uniqueness of every person,
(2) the preservation, improvement or restoration of person’s health, i
(3) the relief of suffering by palliative care and pain management,
(4) the unique nature of artificial nutrition and hydration and the effect it may have on the mentally retarded person,
(5) the entire medical condition of the: person, and no decision shall be based on
(1) a presumption that the mentally retarded are not entitled to equal rights, equal protection, respect and dignity afforded to persons without mental retardation, or
(2) financial considerations of the guardian, a health care provider or any other party.
2. The attending physician confirms to a reasonable degree of medical certainty that the mentally retarded person lacks capacity to make health care decisions which shall be included in the medical record of the patient.
*663 3. The attending physician must consult with another physician or licensed psychologist to confirm the lack of capacity who is:
(a) employed by a developmental disability services office, or
(b) employed two years in a facility licensed by the Office of Mental Retardation and Developmental Disabilities (OMRDD), or
(c) approved by the Commissioner of OMRDD pursuant to regulations, and
(d) a record of the consultation shall be included in the medical record of the mentally retarded person.
4. The attending physician, with concurrence of a consulting physician, must determine to reasonable degree of medical certainty and note on the patient’s chart that the mentally retarded person has:
(a) a terminal condition, or
(b) permanent unconsciousness, or
(c) an irreversible medical condition, and
(d) the life sustaining treatment would impose an extraordinary burden in light of
(1) such person’s medical condition, and
(2) the expected outcome of the life sustaining treatment, and
(e) if the decision is to withdraw artificial nutrition or hydration
(1) there is no reasonable hope of maintaining life, or
(2) the artificial nutrition or hydration imposes an extraordinary burden.
5. The attending physician shall then include the guardian’s decision in the mentally retarded person’s medical chart and either:
(a) issue an order to withhold or withdraw life sustaining treatment, or
(b) promptly object to the decision.
6. In addition, at least 48 hours prior to implementation of such a decision, the attending physician shall notify:
(a) the mentally retarded person, except if notification would cause immediate and severe injury to such person,
(b) the chief executive officer of the licensed facility in which the retarded person is or was transferred from and the mental hygiene legal service, and
*664 (c) the Commissioner of Mental Retardation and Developmental Disabilities or his designee, if the person is not in or was not transferred from a licensed facility.
7. If the attending physician, or any of the above-notified persons, or the parent or an adult sibling of the retarded person, or another licensed practitioner providing services to the retarded person, or the mentally retarded person himself, object to the guardian’s decision it is suspended pending a judicial hearing.
The Supreme Court has propoundbd a balancing test to determine if the procedures established by the state afford the respondent due process. Essentially what is required is a fair procedure. In Mathews v Eldridge (424 US 319, 335 [1976]) the Court said:
“[identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.”
Obviously the “private interest” of ¡the mentally retarded person is far greater when a decision is made to terminate life sustaining treatment as opposed to a regular health care decision. For regular health care decisions, the guardian who is authorized to make such decision determines what is in the best interests of the retarded person and gives consent to the physician to proceed. This procedure is essentially the same as the informed consent given by a parent for medical treatment of his or her child. The guardian is only authorized to make the medical decisions if two physicians or a physician and psychologist have certified the retarded person is incapable of making such decisions for himself or herself and a coúrt has issued letters of guardianship.
As set forth above, the procedures for withholding or withdrawing life sustaining treatment are far more elaborate, as is only appropriate. The real question in applying the Mathews balancing test is the risk of an erroneous decision that could result in deprivation of the life of the mentally retarded *665 person. The Mathews case itself involved the discontinuance of a person’s disability benefits. The Supreme Court recognized that “the decision whether to discontinue disability benefits will turn, in most cases, upon routine, standard, and unbiased medical reports by physician specialists.” (Mathews v Eldridge, supra at 344 [internal quotation marks omitted].) Similarly, in the case of both medical decisions and withdrawal of life sustaining treatment for the mentally retarded under the amended statute the decision turns upon “medical reports by physician specialists,” at least two in every case. These reports must be presumed to be correct. (Youngberg v Romeo, supra.)
Furthermore, in the case of withdrawal of life sustaining treatment the statute provides a series of steps that must be followed and recorded in the patient’s chart. If the physician or any other licensed practitioner providing services to the retarded person or a parent or adult sibling or the chief executive of the facility, or the mental hygiene legal service, or the commissioner, or the retarded person himself, object to the decision to withdraw life support the decision is suspended until a judicial hearing is held. Thus the risk of an erroneous decision after the prescribed procedures have been followed is minimal or nonexistent.
The Constitution does not require a perfect procedure to satisfy due process. Nor does it require a hearing in every case. (Ingraham v Wright, supra.) Rather, due process only requires a procedure that is “rationally related” to a legitimate governmental purpose. The governmental purpose here is to establish reasonable procedures by which duly appointed guardians can make health care decisions, including withdrawal of life sustaining treatment, for mentally retarded persons who are incapable of making such decisions for themselves. Cruzan recognized that the states are authorized to adopt standards for withdrawal of life sustaining treatment. Storar asked the Legislature to adopt such procedures for the mentally retarded in New York. Balancing the requirements for due process as required by Mathews leads to the conclusion that the procedures set forth in SCPA 1750-b are rationally related to the governmental purpose and provide adequate safeguards to protect the retarded from possible erroneous decisions. The procedure is quite extensive and more than fair. If anyone objects to the withdrawal of life sustaining treatment a hearing is held. The Court of Appeals has just held that a similar series of procedural steps based upon physician decision making for assisted outpatient treat *666 ment (Kendra’s Law) complies with due process and equal protection. (Matter of K.L., supra.) It is thus held that the amendments to article 17-A meet the requirements of the Federal and State Constitutions for equal protection and due process for all mentally retarded persohs whose guardians are appointed after the effective date of the amendments.
This decision does not reach the question of whether guardians who were appointed prior to the effective date of the new statute have the authority retroactively to make such medical decisions. The Surrogate of Richmond Cpunty has held that the new health care decision making procedures can be applied retroactively relying on the provisions of SCPA 1750 (2). (Matter of M.B., 2 Misc 3d 328 [2004].) That case was decided on its particular facts and did not discuss any constitutional issues.
In this regard it must be noted that not all mentally retarded persons are the same. As the Supreme Court has noted, mentally retarded individuals fall into four categories: mildly retarded (IQ of 50-70), moderately retarded (IQ of 35-50), severely retarded (IQ of 20-35) and profoundly retarded (IQ below 20). (Cleburne, supra at 442.) It is quite possible that a relatively high functioning retarded person can make some or all of his or her own medical decisions. For example, in Matter of B. (190 Misc 2d 581 [2002]), the court held that a woman with an IQ of 62 had sufficient capacity to make the decision to and give informed consent for having a tubal ligation.
Yet for retarded persons who had a guárdian appointed before the effective date of amended SCPA 1750-b, the procedures then in effect did not require the physician or psychologist to certify whether or not the retarded person could or could not make health care decisions. Since no professional certification was required, there was nothing that could now be presumed to be correct. Thus, the retarded person had no opportunity to contest the appointment of a guardian with authority to make medical decisions and no opportunity for a hearing. (Cf. Rivers v Katz, 67 NY2d 485 [1986].) Since there was no procedure for the guardian to receive authority for health care decision making prior to 2002, there was not even an opportunity for due process.
Turning now to the facts of this case, the court has already held in its bench decision that the grandmother would be appointed temporary guardian with authority to make health care decisions, including the withdrawal of life sustaining treatment. As recited above, both neonatologists who testified stated *667 Baby W.’s condition was terminal and irreversible and represented an extraordinary burden to the baby. They both indicated the baby’s prognosis was “dismal” and that the ventilator, tube feeding and suctioning required to sustain life were painful and basically that there was no reasonable hope of maintaining life.
In a similar case, Matter of AB (196 Misc 2d 940 [Sup Ct, NY County 2003]), the court held that the mother of a 31/2-year-old child could consent to the removal of a mechanical ventilator. AB had a seizure and collapsed and as a result could not “smile or respond to her mother; she cannot play, eat or speak.” (Id. at 941.) She was diagnosed as being in a “persistent vegetative state.” (Id.)
Even though not strictly applicable since AB was not diagnosed as mentally retarded, the court reviewed the requirements of SCPA 1750-b and determined that their requirements had been exceeded. “[N]umerous physicians, including treating physicians and independent experts, have certified that AB is in a persistent vegetative state from which there is no possibility of recovery.” (Id. at 953.) Further, since the child was SVs and permanently unconscious, she lacked capacity to make health care decisions for herself. The same is true of Baby Boy W.
Accordingly, the court has already determined that the requirements of SCPA 1750-b for withdrawal of life sustaining treatment have been met. An order has been signed providing for the appointment of the grandmother as guardian and among other things that she “is authorized to make any and all health care decisions for Baby Boy W. including decisions to withhold or withdraw life sustaining treatment, including artificial nutrition and hydration.”