OPINION OF THE COURT
Eve Preminger, S.
Petitioner Pamela R. is the mother of Chantel R., a 26-year-old woman who is mentally retarded. Petitioner seeks appointment under article 17-A of the Surrogate’s Court Procedure Act as guardian of her daughter’s person. Respondent Mental Hygiene Legal Service (MHLS) objects to the extent that the guardianship includes authority to withhold or withdraw life-sustaining treatment under SCPA 1750-b, recently enacted as the 2002 Health Care Decisions Act for Persons with Mental Retardation (the HCDA). MHLS challenges the constitutionality of SCPA 1750-b on various grounds. A hearing on the petition for guardianship was held by the court.
At the hearing, three experts, the supervising psychologist and director of clinical services at the residence facility where Chantel resides, the independent psychologist designated at MHLS’s request, and the medical director of the Association for the Help of Retarded Children testified about their interviews with Chantel and their opinions of her capacities. The witnesses focused on Chantel’s cognitive abilities, her relationship with petitioner, and her desire to have petitioner make health care decisions on her behalf. They all observed that Chantel trusts petitioner without limitation, understands the idea of relying on petitioner to make decisions on her behalf, wants petitioner to do so, and trusts petitioner to act in her best interests. The testimony also showed that Chantel’s recent move from her home with petitioner to a residential facility was successful and that Chantel continued to have a strong and loving relationship with petitioner. The experts concurred that Chantel functions intellectually at or around the level of a seven-year-old child, and has no ability to think abstractly or imagine a future situation in which she is gravely ill or unconscious.
The testimony also showed that Chantel has some understanding of the idea of “death” as opposed to “life,” but has no grasp of the concept of being kept alive through machinery or artificial nutrition and hydration. The witnesses testified that Chantel showed a good deal of anxiety when specifically asked about such matters, that she responded “no” when asked whether she wanted petitioner or anyone else to stop providing her with food, water or air, and that she expressed a desire not to die. *695 However, each witness expressed a belief that such statements did not constitute “objections” to having life-sustaining treatment withheld or withdrawn since Chantel lacked cognitive understanding of the questions.[1]
On the witness stand, Chantel had a serious but friendly demeanor, and was poised and eager to cooperate. Her responses were consistent with the answers she gave in the interviews with the expert witnesses. Chantel testified that she definitely wanted petitioner to make decisions for her. When questioned, she stated that she did not want food or water removed even if she was always going to be asleep and was never going to get better because she did not want “to be sick” and did not “want [anything] to happen to [her].” Responding to the court’s inquiry, Chantel testified that she did not know what it meant to be “unconscious” or “asleep.” There was no indication that Chantel understood the questions she was answering or the concept of being permanently unconscious and/or kept alive by artificial means.
The right to refuse unwanted medical treatment is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment of the US Constitution. (Cruzan v Director, Mo. Dept, of Health, 497 US 261 [1990].) Treating persons in the end stages of dying with compassion and dignity is integral to this interest, which has often been compromised by technological advances, particularly in the area of life support. The resulting legal and ethical issues are ones which society has yet to resolve. (See Matter of AB, 196 Misc 2d 940 [2003]; Matter of Beth Israel Med. Ctr. [Weinstein], 136 Misc 2d 931 [1987]; see also Ouellette, When Vitalism is Dead Wrong: The Discrimination Against and Torture of Incompetent Patients by Compulsory Life-Sustaining Treatment, 79 Ind LJ 1 [Winter 2004].)
The HCDA was designed to settle one of these issues by creating a procedure for a guardian to refuse life-sustaining treatment on behalf of a mentally retarded person where no such procedure previously existed.[2] Article 17-A of the SCPA has regulated the appointment of guardians for mentally retarded *696 persons since its enactment in 1969. (L 1969, ch 1143.) Prior to the HCDA, SCPA 1750 provided for a guardian to be appointed for a mentally retarded person who was certified as being incapable of managing his or her person and/or affairs because of mental retardation with no likelihood of change. None of the provisions in article 17-A described the decision-making authority that the statute granted to guardians. However, guardians were understood to have implied authority to make health care decisions for their wards. (See Senate Introducer Mem in Support, Bill Jacket, L 2002, ch 500; 2002 NY Assembly Bill A 8466D.)
This authority was severely curtailed by the New York Court of Appeals decisions in cases such as Matter of Storar (52 NY2d 363 [1981], cert denied 454 US 858 [1981]) and Matter of Westchester County Med. Ctr. (O’Connor) (72 NY2d 517 [1988]) in which the Court held that “clear and convincing” evidence of a person’s desire to refuse life-sustaining treatment was required before a third party could effectuate such a decision on someone’s behalf. Because mentally retarded persons are often incompetent to manage their affairs, let alone express their preferences with “clear and convincing” evidence, the case law effectively deprived them of the opportunity to refuse intrusive life-sustaining procedures even where their physicians and caregivers advocated otherwise.
The HCDA was instigated by public outcry in the aftermath of the case of Sheila Pouliot, a 47-year-old woman who was profoundly retarded since birth. Since Ms. Pouliot never had competence to provide “clear and convincing” evidence of her wish to refuse life-sustaining treatment, she was forced to accept treatment which subjected her to a protracted and unnecessarily painful demise. (See Blouin v Spitzer, 213 F Supp 2d 184 [2002], affd 356 F3d 348 [2004].) Responding to the Court of Appeals’ suggestion that legislative relief was required to resolve this dilemma (see Matter of Storar, supra), the New York State Legislature sought to clarify the authority that was impliedly granted under article 17-A by enacting the HCDA.
The new statute expressly authorizes the guardian for a mentally retarded person[3] to make “any and all” health care decisions for a ward that a person with capacity could make, *697 which “may include” decisions to withhold or withdraw life-sustaining treatment. (SCPA 1750-b [1].) The legislation includes a decision-making standard (SCPA 1750-b [2]), and outlines the circumstances under which a decision to withhold or withdraw life-sustaining treatment might be made and the procedures that must be followed (SCPA 1750-b [4] [a]-[e]).
In alleging that SCPA 1750-b is deficient, MHLS makes four principal arguments. First, MHLS contends that SCPA 1750-b improperly fails to require a determination that a mentally retarded person is unable to make health care decisions for herself before conferring authority upon a guardian to make end-of-life decisions on her behalf. Second, MHLS argues that the test applied to determine a mentally retarded person’s capacity to make health care decisions violates equal protection principles. Third, MHLS argues that the statute improperly fails to mandate a standard or procedure to be followed in the event a mentally retarded person objects to the appointment of a guardian authorized to make health care decisions on her behalf. Fourth, MHLS suggests that the statutory test for terminating life support for a mentally retarded person is impermissibly vague.
MHLS claims that SCPA 1750-b violates due process because the statute grants guardians who were appointed before the statute’s enactment in March 2002 the authority to withhold or withdraw life-sustaining treatment without requiring a finding that a mentally retarded person is incapable of making “end of life” decisions.[4] However, the instant petition was brought after the effective date of the new law, which expressly requires a finding of incapacity to make health care decisions before authority to withhold or withdraw life-sustaining treatment may be granted, and such a determination was in fact made in this case.
With respect to guardians appointed under the new law, the court is given no discretion to dispense with a determination of incapacity. A mentally retarded person is defined as a person who has been certified by two doctors (or one doctor and one psychologist) as being incapable of managing herself and her affairs due to mental retardation. The statute further requires a specific determination by those professionals as to whether the *698 mentally retarded person has capacity to make health care decisions, as evidenced by SCPA 1750 (2) (every doctor certification “shall include a specific determination ... as to whether the mentally retarded person has the capacity to make health care decisions . . . for himself or herself” [emphasis added]). The court, after evaluating the medical determination, must then render its own judgment as to whether the mentally retarded person is capable of making her own health care decisions. (See SCPA 1750-b [1] [“Unless specifically prohibited by the court after consideration of the determination, if any, ([5]) regarding a mentally retarded person’s capacity to make health care decisions, which is required by section seventeen hundred fifty of this article” (emphasis added)].) In the event it is determined that the mentally retarded person has capacity to make health care decisions, the statute contemplates that a guardian may nevertheless be appointed by the court to make nonhealthrelated decisions on behalf of his ward. (See SCPA 1750 [2].) There is no question under the new statute that a finding of incapacity to make health care decisions is a condition precedent to granting a guardian authority to make those decisions on behalf of a mentally retarded person.
MHLS next claims that SCPA 1750-b violates the Equal Protection Clause of the US Constitution if interpreted to require mentally retarded persons seeking to make their own end-of-life decisions to be able to understand the nature and consequences thereof. The crux of MHLS’s argument is that a mentally retarded person should be allowed to make irrational or unreasoned health care or end-of-life decisions, just as a competent person might. This argument does not in fact raise equal protection issues because a mentally retarded person is being treated no differently from a competent person.[6]
*699 The statute does not impose a different standard in requiring that a mentally retarded person be capable of understanding the medical choices available to her and the potential consequences of the decisions made. Thus, while MHLS correctly states that it should be of no moment whether a mentally retarded person’s medical choices are considered to be rational or irrational, it ignores the fact that a mentally retarded person must first be capable of choosing to make an emotional or irrational decision. She would then be free to make decisions in the same manner as any other person. Persons with capacity who make emotional or irrational decisions about their medical treatment do so knowing that there is a meaningful choice to be made and that any given choice has a possible range of identifiable consequences. If they remain uninformed concerning their medical condition, treatment, and prognosis, they likewise do so by choice. A mentally retarded person who has never had capacity does not have that choice.
Where, as here, the answers given by the mentally retarded person show that she does not have a true appreciation of the consequences of any given health care decision or even the context in which such a decision might arise, it is obvious that those answers lack any true meaning. It would be a disservice to Chantel under those circumstances to give her utterances effect and thereby deny her the assistance of a guardian who is able to act in her best interests.
MHLS also argues that SCPA 1750-b denies Chantel due process because it fails to mandate a hearing or other procedure for the proposed ward to object to the power sought by the guardian to withhold or withdraw life-sustaining treatment. MHLS further contends that once an objection has been lodged by a mentally retarded person, no statutory standard or procedure has been established for overcoming the objection.
The hallmark of due process is the opportunity to be heard “at a meaningful time and in a meaningful manner.” (Armstrong v Manzo, 380 US 545, 552 [1965].) SCPA 1754 (1) requires the court to conduct a hearing on the petition for appointment of a guardian of a mentally retarded person, at which the proposed ward has a right to a jury and a forum for object *700 ing to the appointment of the guardian or the delegation of authority under SCPA 1750-b. The same provision gives the court discretion to dispense with that hearing where it is the proposed ward’s natural parents who apply for guardianship, where one parent applies with the other’s consent, or where both parents or the surviving parent nominate a party to serve as guardian.[7]
The parental exception to the hearing requirement, initially legislated by Laws of 1978 (ch 490), reflects the tension between the competing interests of patient autonomy and parental rights. In this case, the court did hold a hearing to examine the physician and psychologists certifying as to Chantel’s lack of capacity to make health care decisions, as well as petitioner and Chantel herself. As a result, the court need not decide whether the discretion to dispense with a hearing under SCPA 1754 violates due process. Nevertheless, the court wishes to note its concerns regarding statutory exceptions to the hearing requirement.
Although parental decisions are deserving of great deference given the likely depth of their knowledge of their children’s cognitive and emotional abilities and experiences (see Heller v Doe, 509 US 312 [1993]), the court queries whether, in light of the exceptional authority that may now be granted under SCPA 1750-b, it would ever be appropriate both to dispense with a hearing and to fail to appoint a guardian ad litem to represent a mentally retarded person’s interests. To do so may deprive a mentally retarded person of a meaningful opportunity to object to the power sought by a proposed guardian to make health care decisions on her behalf. In the absence of a hearing or the appointment of a guardian ad litem, it is possible under the procedures prescribed by the statute that the court would never even learn of a mentally retarded person’s objection.
It is true that the statute affords mentally retarded persons the opportunity to object to the guardian’s decision to withdraw or withhold life-sustaining treatment at the time such decision is sought to be made, which objection would trigger a judicial *701 review. This alone, however, would not appear to guarantee a mentally retarded person sufficient opportunity to voice a meaningful objection. Any such objection would be directed not to the appointment of the guardian but rather to the guardian’s subsequent treatment decisions. Moreover, at the time the guardian’s decision-making power is actually exercised, it is likely that the mentally retarded person will be unconscious, very sick, or in great pain and therefore physically incapable of lodging an objection. Even more significantly, notice to the mentally retarded person that life-sustaining treatment is being withdrawn may be dispensed with if the attending physician determines that the mentally retarded person would suffer “immediate and severe injury from the notification.” (SCPA 1750-b [4] [e] [i].) Therefore, it is conceivable that, without a hearing prior to the guardian’s appointment, a mentally retarded person would never have a meaningful opportunity to voice an objection to the grant of end-of-life decision-making power to the guardian.
Assuming a hearing is held and an objection is lodged by a mentally retarded person, MHLS complains that no procedure is mandated and no standard is required to be applied to overcome the objection. In fact, the court is permitted to appoint a guardian only if the best interests of the mentally retarded person will be promoted by the appointment. (SCPA 1750, 1754 [5].) Such a best interests determination would necessarily require the court to consider, as this court has done, the nature and seriousness of any objection lodged by the mentally retarded person in the context of her capacity to participate meaningfully in the appointment process. Under the three-pronged test promulgated by Mathews v Eldridge (424 US 319 [1976]),[8] there is little risk of an erroneous deprivation of a right to make one’s own health care decisions given that the court will consider any objection in light of the best interests of the mentally retarded person and in the context of the evidence required to be submitted by at least two qualified experts *702 establishing the extent and severity of the ward’s incapacity. The court’s authority to deny the appointment of a guardian for health care decisions and the statutory standard to which the court is held in making the appointment of a guardian offer sufficient due process protection to an incapacitated objecting ward.
Finally, MHLS argues that the statute’s standard for the termination of life support is unconstitutionally vague. Under SCPA 1750-b (4) (b) (i) and (ii), life support may be terminated when an attending physician determines to a reasonable degree of medical certainty that a mentally retarded person has a terminal medical condition or is permanently unconscious or has an irreversible medical condition requiring life-sustaining treatment and life-sustaining treatment would impose an “extraordinary burden” on the mentally retarded person in light of (1) her medical condition, and (2) the expected outcome of life-sustaining treatment (notwithstanding mental retardation). MHLS argues that the “extraordinary burden” standard is so broad as to give the court the power to decide if a mentally retarded person’s life is worth living. Without conceding that the void for vagueness doctrine applies to a civil statute (see Colten v Kentucky, 407 US 104 [1972]), the court disagrees.
The extraordinary burden standard imposed in the event a guardian makes a decision to withdraw or withhold life-sustaining treatment requires a determination by the attending physician, in consultation with another physician, that the treatment course would pose an “extraordinary burden” on the mentally retarded person in light of two discrete factors: her current medical condition and her prognoses if treatment is undertaken. This standard does not, as MHLS suggests, afford the guardian unfettered discretion to determine that the mentally retarded person’s life is simply not worth living. Indeed, it does not even measure the quality of her existence (as does the separate “best interests” standard, discussed below). Rather, under this narrow standard seeking to ascertain the burden of continued treatment, the guardian is directed to consider only the current physical condition of his ward (unrelated to the ward’s mental retardation) and the likelihood of recovery in the event of medical intervention.
At any rate, the extraordinary burden standard — imposed only in the event that the guardian seeks to withhold or withdraw life-sustaining treatment — is but one of several standards that the guardian is statutorily mandated to apply before rejecting life-sustaining measures. Its application in no way *703 relieves the guardian of his independent responsibility with respect to all treatment decisions to take into account the known wishes (including moral and religious beliefs) of the mentally retarded person and to make an independent assessment of her best interests in light of her dignity, her suffering and the efficacy of palliative care and pain management, the effect that artificially provided nutrition and/or hydration may have, and the possibility of preserving, restoring or improving her health. Additionally, application of the extraordinary burden standard does not relieve a guardian of his duty to presume that his ward is entitled to the same aggressive medical care and patient rights that would be afforded a person without mental retardation. Nor is a guardian relieved of his statutory obligation to ignore the financial consequences of any medical decision he makes.
These standards, all of which must be met in making a decision to suspend or withhold life-sustaining treatment, certainly do not invest “unlimited discretion in the decision-maker,” as alleged by MHLS. While together they permit a guardian to consider any pain experienced by the mentally retarded person and the possibility of its amelioration through medical intervention (a factor which MHLS has observed was of particular concern to the New York Court in Storar), they also require a thorough analysis of all aspects of the patient’s medical state, prognosis, and expressed wishes before permitting the rejection of life-sustaining treatment.
Based on the evidence, the court concludes that Chantel is not competent to make health care decisions on her own behalf, including, a fortiori, decisions regarding life-sustaining treatment. This court finds that Chantel has not lodged a competent objection to the appointment of a guardian to make health care decisions on her behalf because of her inability to understand the issues. The court-appointed guardian ad litem separately interviewed Chantel (SCPA 403 [2]) and recommends granting the application without reservation. The court also finds that Chantel trusts petitioner to act in her best interests and that petitioner will unquestionably do so.
The petition for guardianship is granted in its entirety, and amended letters of guardianship shall issue forthwith.

. The independent psychologist testified that he did not discuss “end of life” decisions with Chantel, but affirmatively stated that he did not believe Chantel had sufficient cognitive awareness to participate in such a discussion.

. “Life-sustaining treatment” under SCPA 1750-b (4) is defined pursuant to section 81.29 (e) of the Mental Hygiene Law as medical treatment which sustains life function and, without which, according to reasonable medical *696 judgment, death would result in a relatively short time. (Mental Hygiene Law § 81.29 [e].)

. Article 17-A does not grant such authority to guardians for developmentally disabled persons.

. The constitutionality of SCPA 1750-b was previously upheld in Matter of Baby Boy W. (3 Mise 3d 656 [2004]) where the court granted an uncontested petition for temporary guardianship with authority under SCPA 1750-b. (See also Matter ofAB, 196 Misc 2d 940 [2003].)

. MHLS makes much of this “if any” language as it appears in SCPA 1750-b (1), suggesting that it renders the incapacity determination optional even with respect to guardianships under the new law. This is incorrect. SCPA 1750-b (1) gives guardians — regardless of whether they were appointed under the old statute or the new statute — the authority to make health care decisions on behalf of their wards. The phrase “if any” as it appears in SCPA 1750-b (1) refers to proceedings under the old statute in which no determination of the mentally retarded person’s capacity to make health care decisions was made prior to appointment of the guardian.

. It has been held appropriate to treat mentally retarded persons differently where such treatment furthers a legitimate state interest. (See Heller v Doe, 509 US 312 [1993].) There is no question that legislation to protect persons who cannot act in their own interest is rationally related to a legiti *699 mate governmental purpose. (See City of Cleburne, Tex. v Cleburne Living Ctr., 473 US 432 [1985].) Indeed, SCPA 1750-b was enacted to ensure that mentally retarded persons such as Chantel are not made to suffer needlessly simply because they do not have sufficient cognitive ability to understand the medical choices that they may face.

. SCPA 1754 (3) requires the proposed ward to attend the hearing unless evidence shows it is not in the mentally retarded person’s best interests. If the court exercises discretion to dispense with a hearing or the mentally retarded person is excused from attending a hearing, the court may appoint a guardian ad litem if a Mental Hygiene Legal Service attorney is not authorized to act on behalf of the mentally retarded person. (See generally 3-49 Warren’s Heaton, Surrogates’ Courts § 49.05 et seq.)

. Mathews v Eldridge requires that three factors be considered in analyzing a procedural due process challenge: (i) the private interest that will be affected by the official action (in this case, the mentally retarded person’s interest in not having a guardian appointed for the purpose of making health care decisions); (ii) the risk of erroneous deprivation of such interest through the procedure employed by the statute, and the probable value, if any, of additional or different procedural safeguards; and (iii) the State’s interest, including the function involved and the fiscal and administrative burdens that such procedural changes would engender.