OPINION OF THE COURT
Karen V. Murphy, J.
*566 Petitioner having applied to this court for an order directing DH, a patient at Nassau University Medical Center, to show cause why an order should not be granted authorizing or discontinuing medical treatment for the patient as set forth in the petition and this application having come on to be heard before the undersigned, a Justice of the Supreme Court of the State of New York, County of Nassau, on November 14, 2006.
Now, upon the petition of Arthur Gianelli, as president and CEO of the Medical Center, verified on November 13, 2006, and the affirmation of Peter Ciminera, M.D., dated November 13, 2006, and upon the order to show cause granted on November 13, 2006, together with due proof of service thereof, and Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einger, LLP Allan E. Silver, Esq., of counsel, attorneys for the Medical Center, appearing in support of the application, and David A. Smith, Esq., acting as the court appointed guardian ad litem, appearing herein to protect the rights and interests of DH, the parents of DH, MD and DH, appearing in support of their request to discontinue medical treatment for their son, and a hearing having been held upon the issues raised herein, the court makes the following findings of fact and law.
DH is a 14-year-old boy, suffering from Hunter syndrome, a serious genetic disorder. Hunter syndrome is, according to his treating physician’s testimony, an enzymatic defect with a build up of mucopolysacchardies in the connective tissue. He suffers from various defects in bone, cartilage and connective tissue, as well as a seizure disorder, congenital heart disease and valve insufficiency in the mitral and aortic valves. The defects in the aortic and mitral valves will eventually be fatal. D also suffers from an enlarged liver and spleen as well as characteristic facial features, including an enlarged tongue. The disease affects the airways, trachea and large bronchial tubes, in that the structural support disappears and they collapse. There is no known cure and the doctor testified that the disease will be fatal within the next two years.
D was admitted to Nassau University Medical Center (NUMC) on June 13, 2006 because he was experiencing difficulty breathing. Within a day of admission, he was placed on a ventilator to enable him to breathe. After he was tracheid, in order to stop aspiration, which had begun, a feeding tube was inserted into his stomach (PEG tube). His condition is considered stable. He is alert, tracks people with his eyes, recognizes his mother and seems to enjoy cartoons and video tapes. Doctor Ciminera testified that D is completely aware.
*567 D is generally not in pain, though he makes it known that he does not like to be suctioned. He experiences pain when he is moved because he is edematous. His connective tissue is filled with water, making him very tight. He is not on any pain medication due to the fleeting nature of the pain, which according to the testimony is felt when he is moved, washed or suctioned.
D was not present for the hearing; however, the court did visit the patient in the pediatric ICU. The court was advised that D had been suctioned shortly before our arrival at his bedside. He appeared to be resting comfortably, in no obvious distress, though his breathing did seem labored.
Lauri Haufler, nurse manager of the pediatric ICU, testified regarding D’s condition. She explained that D is awake, responds to tactile stimulation, tracks and looks at cartoons and movies and tracks his parents when they visit him. She testified that his face brightens when he sees his parents, which in her mind indicates that he is happy to see them. She has observed that he is calm when watching videos and that if he watches videos after he is washed or suctioned his heart rate goes right down and he is relaxed and breathes more easily.
D’s mother and father both testified that they understood that removing the ventilator would hasten D’s death, but felt that this was in his best interests to end his suffering. Ms. D testified that D has come to her in her dreams and has encouraged her to let him go and to accept her newborn daughter. D is always happy and at peace in her dreams.
There can be no doubt that Ms. D is a devoted mother and has taken extraordinary care of D. She worked closely with doctors and nutritionists as D’s condition deteriorated and his ability to eat or drink was curtailed. She massaged D to give him comfort. There is no question that she and her husband want what is best for D. They are aware that his disease is progressive and that he is likely nearing the end of his life. Ms. D visits D every day in the hospital and was his primary caregiver until he was admitted.
Upon Ms. D’s request to remove D from the respirator and to end other medical care, Dr. Ciminera requested that the hospital’s medical ethics committee review the case. Dr. Ciminera was not in agreement with the parents’ decision. Dr. Mondschein, the chairman of the medical ethics committee, testified in this matter. He and a team of two other people, a priest and a nurse, reviewed the medical record and saw the child.
*568 Dr. Mondschein testified that he was experienced in pediatrics, though he was now serving in an administrative position at the hospital. The nurse on the team was not a pediatric nurse. Dr. Mondschein was not familiar with Hunter syndrome except in a general way and had no experience with it in his practice. In fact, he took out a book on inherited diseases for the other members of the team and he “reviewed it quickly.” When asked about which congenital defects D suffers from, he stated that he “didn’t go into that.” He indicated that D was awake, but would not call him alert. Dr. Mondschein could not ascertain whether D could track him with his eyes or whether he felt pain. The committee also met with Ms. D, who expressed her concerns to the committee.
The concerns considered by the committee included Ms. D’s 14 years of being the sole caretaker of D and her opinion that he was in pain and discomfort and that this was being prolonged by artificial means, due to the respirator. Ms. D was also concerned that because of the pending transfer of D to a nursing home in Suffolk County she would not be able to care and comfort him every day, that the new caregivers would not understand what was going on with D and the discomfort he might be feeling, nor would they be able to interpret his needs. She was also concerned with how God would see her in making this decision. The priest serving on the committee advised Ms. D that if she made this decision with love in her heart for the child, then God will not judge her harshly.
The members of the ethics committee independently came to the conclusion that the mother’s decision was an ethical one, since it was based upon her feeling for the child and her concern for the well-being of her child. Dr. Mondschein testified that removing the ventilator would hasten the dying process. When asked if that was a course of treatment, he indicated that “not doing is also treatment.” Dr. Mondschein was aware of Dr. Ciminera’s opinion that the ventilator should not be removed because D is “no where near terminal” and opined that this is a very hard decision. Ultimately, Dr. Mondschein indicated that, based upon his overall review of the medical records, speaking with the parents and seeing D, it was his professional opinion that it would be an acceptable course of treatment to stop the ventilator and to provide palliative care and pain relief, while the dying process occurs.
Dr. Peter Ciminera is the director of pediatric critical care at NUMC. He is board certified in pediatric medicine and is board *569 eligible for a fellowship in pediatric critical care and has completed a fellowship in ambulatory pediatrics. He has examined D and reviewed his records daily since admission in June. After consulting with D’s parents, Dr. Ciminera wrote a “Do Not Resuscitate” (DNR) order on June 26, 2006. The doctor believes it is still medically appropriate to continue the DNR order because “resuscitation would impose an extraordinary burden on the patient in light of the patient’s medical condition and the expected outcome of the resuscitation for the patient” in that if D suffered “cardiac arrest, all that anoxia would cause more damage and bringing him back would add more damage to an already damaged system.”
Dr. Ciminera testified, however, that it is not medically appropriate to remove the ventilator at this time because D is alert and can sense his surroundings. The doctor is aware that D is eventually going to die, but stated that the patient is not medically at the point where he is unresponsive. Dr. Ciminera has been involved in removing the ventilator from other patients, but they have always been comatose. He said “[b]eing in a coma is absolutely nothing, no quality of life, but D enjoys looking at Ty is attentive ... he knows you are there and it is very hard. He is completely aware.” Dr. Ciminera would feel very uncomfortable removing the ventilator from D because he is “a child awake who cannot express his wishes.”
The guardian ad litem David A. Smith testified in the narrative form. Mr. Smith acknowledged the cooperation of all parties and the superb care that D was receiving at the hospital. He reported that Dr. Mondschein’s note in the chart on November 7, 2006 indicated the members of the ethics team “feel that the mother speaking for herself and her husband are not unethical in requesting their son be weaned from the respirator. We feel that this difficult decision was carefully thought out by them and should be supported.” Mr. Smith utilized the standard set forth by the Court of Appeals in Matter of Hofbauer, wherein a neglect petition was denied because the Court found that
“[ultimately, however, the most significant factor in determining whether a child is being deprived of adequate medical care, and, thus, a neglected child within the meaning of the statute, is whether the parents have provided an acceptable course of medical treatment for their child in light of all the surrounding circumstances” (Matter of Hofbauer, 47 NY2d 648, 656 [1979]).
*570 The parental responsibility for management of a child’s medical care should not be displaced absent statutory authority or compelling state interest. (Matter of Weber v Stony Brook Hosp., 60 NY2d 208 [1983].) Mr. Smith was supportive of the parents’ decision to remove D from the respirator in light of the testimony of Dr. Mondschein on behalf of the hospital’s ethics committee.
There is no neglect proceeding pending or contemplated, but given the lack of case law or statute governing this sensitive and heart-wrenching issue, the reliance on the Hofbauer analysis was a thoughtful one, offering some guidance in this challenging and murky area of the law.
Since the 1960s, the miracles of modern medicine and science have had a significant impact on life and death and blurred the line between the two. Members of our society now enjoy a healthier and longer life. Conditions which would have resulted in certain death are now treatable and curable. On the other hand, people can be kept alive through artificial means without any hope of recovery, cure or even improvement in their condition. The ability of doctors to artificially keep bodies alive after the brain and other organs have ceased to function normally has given rise to many ethical and moral dilemmas and arguments, with no clear answers.
The use of artificial means to keep people alive has been a controversial topic, which has riveted and divided the nation. Sunny Von Bulow, Karen Ann Quinlan and Terri Schiavo became household names as the media extensively covered their tragic stories and families, friends, neighbors, advocates on both sides of the issue and elected officials shared their views. Defining what constitutes “artificial means” has also been the subject of heated debate. The courts have not resolved these issues in any global sense, often urging the Legislature to act, and, to a limited degree in New York, laws have been enacted that begin to address end-of-life decisions. (See, SCPA 1750, 1750-b; Public Health Law arts 29-B, 29-C; Mental Hygiene Law art 80.)
State decisions vary, with New York having one of the strictest standards. (See, Matter of Quinlan, 70 NJ 10, 355 A2d 647 [1976], cert denied sub nom. Garger v New Jersey, 429 US 922 [1976]; Cruzan v Director, Mo. Dept. of Health, 497 US 261 [1990]; Blouin ex rel. Estate of Pouliot v Spitzer, 356 F3d 348 [2d Cir 2004]; In re Guardianship of Schiavo, 916 So 2d 814 [Fla Dist Ct App, 2d Dist 2005].) A person who is competent can refuse to accept medical treatment. (Schloendorff v Society of N.Y. Hosp., 211 NY 125 [1914]; Matter of Westchester County *571 Med. Ctr. [O’Connor], 72 NY2d 517 [1988]; Matter of Fosmire v Nicoleau, 75 NY2d 218 [1990].) A “clear and convincing” evidence standard must be satisfied in order to terminate artificial life support for a now-incompetent patient based upon that patient’s previously-expressed wishes, while competent, not to be kept alive by artificial means. (Matter of Storar, 52 NY2d 363 [1981]; Matter of Westchester County Med. Ctr. [O’Connor], supra.) The right to decline treatment is a personal one and cannot be exercised by a third party when the patient is unable to do so. The Court of Appeals has refused to make a judgment as to what is for another an unacceptable quality of life. (People v Eulo, 63 NY2d 341 [1984].) No person or court should substitute its judgment as to what would be an acceptable quality of life for another. (Blackman v New York City Health & Hosps. Corp., 173 Misc 2d 562 [Sup Ct, Kings County 1997], read in part on other grounds 249 AD2d 539 [2d Dept 1998].) However, if it is shown by clear and convincing evidence that the patient, if competent, would have rejected nutrition and hydration by artificial means, the clearly expressed desires of the individual to die with dignity should be honored (Matter of Delio v Westchester County Med. Ctr., 129 AD2d 1 [2d Dept 1987]). “The evidence must be unequivocal when the decision to terminate life support is at issue” (Matter of Kushnir, 177 Misc 2d 352, 354 [Sup Ct, Queens County 1998], citing Matter of Westchester County Med. Ctr. [O’Connor], supra).
In determining whether it is appropriate to exercise the State’s parens patriae authority to protect those citizens unable to care for themselves, four compelling state interests must be weighed by the courts in making medical treatment decisions: (1) the preservation of life; (2) the prevention of suicide; (3) the protection of innocent third parties; and (4) the maintenance of the ethical integrity of the medical profession. (Matter of Delio v Westchester County Med. Ctr., supra.)
The most significant of the four interests is the preservation of life, which is particularly compelling when dealing with a child. Courts have looked to determine the patient’s best interests by deciding whether the evidence establishes that the “burdens of prolonged life outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life” (Matter of AB, 196 Misc 2d 940 [Sup Ct, NY County 2003], citing Matter of Beth Israel Med. Ctr. [Weinstein], 136 Misc 2d 931 [Sup Ct, NY County 1987]). Medical treatment may not be withheld simply because a third *572 party believes that the quality or prognosis is less than optimal. (Id.) Indeed, much has been written of the importance of assessing the life to be lived from the individual patient’s perspective. (See generally, Miller, Listening to the Disabled: End-of-life Medical Decision Making and the Never Competent, 74 Fordham L Rev 2889 [Apr. 2006]; Will, My God My Choice: The Mature Minor Doctrine and Adolescent Refusal of Life-Saving or Sustaining Medical Treatment based upon Religious Beliefs, 22 J Contemp Health L & Pol’y 233 [Spring 2006]; Germinara, Critical Essay: Musings on the Need to Convince Some People with Disabilities that End-of-life Decision Making Advocates Are Not Out to Get Them, 37 Loy U Chi LJ 343 [Winter 2006].) The fundamental right of a parent to raise his or her child and make decisions on the child’s behalf is given great deference. (Matter ofAB, supra.) For example, Public Health Law § 2504 authorizes parents to give effective informed consent on their child’s behalf and parents have authority, where a minor lacks capacity to make a decision regarding resuscitation, to consent to an order not to resuscitate, pursuant to the provisions set forth in Public Health Law § 2967.
In Matter ofAB, a healthy, vibrant 3V2-year-old girl suffered a seizure. She was unable to respond to stimulation and could not experience joy or any other emotion, and could not respond to her mother; nor could she eat, play or speak. She was in a persistent vegetative state. The court authorized the mother to consent to the removal of mechanical ventilation because there was
“no state interest great enough to compel AB to remain subjected to this extraordinary life-sustaining measure. To do so would merely prolong the death of a terminally ill child, wholly lacking in cognitive brain functioning, completely unaware of her surroundings, and with no hope of ever regaining awareness, while subjecting her to daily physical intrusions including catheterizations, feeding tubes, IV’s and increasing infections.” (196 Misc 2d at 961.)
Unlike the Matter ofAB case, the parents, guardian ad litem, treating physicians and the hospital are not in agreement that discontinuing the ventilator is in D’s best interests. Had they been, it is unlikely that this case would have necessitated judicial intervention. Contrary to the facts of Matter of AB, where the child was unaware and completely lacking in brain *573 function, the treating doctor and nurse both testified that D is aware and enjoys TV and videos. D recognizes his mother. This court appreciates that young D has lived a very difficult life, suffering from a progressive life-threatening and altering disease. It is, however, D’s life to live and this court will not consider or determine whether it is a life worth living from anyone’s perspective other than D’s.
In this case, neither the second nor third prong, as applied to the facts of this case, warrant the exercise of the State’s parens patriae authority. There is no intent to commit suicide, nor are minor children dependent upon D for support. D’s parents are seeking to discontinue treatment. Thus, the interest in the protection of third parties has no basis herein.
Looking at the integrity of the medical profession, in the context of D’s care, this court is faced with Dr. Ciminera’s and Nurse Haufler’s strong objections to the cessation of treatment at this time. They will not participate in removing D from the respirator. The court is cognizant that the hospital is preparing to discharge D to a nursing home, but even if that was not the case, neither Dr. Ciminera nor Ms. Haufler would be directed to participate in the termination of the life-sustaining treatment. This court is persuaded that the weight of the evidence tips in favor of continuing treatment and notes that neither Ciminera nor Haufler was opposed to the possibility that, at some future date, removal of the ventilator would be appropriate, but, rather, stated that they were opposed to it at the time of the hearing, while D was aware, responsive and not in pain.
While this is not an application pursuant to SCPA 1750-b, this court has considered the requirements set forth therein for withdrawal of life-sustaining treatment. (See, Matter of Baby Boy W., 3 Misc 3d 656 [Sur Ct, Broome County 2004]; Matter of Chantel R., 6 Misc 3d 693 [Sur Ct, NY County 2004]; Matter of M.B., 6 NY3d 437 [2006].) D lacks the capacity to consent to his medical treatment and is suffering from a disease which is progressive in nature and will ultimately lead to his death, though there is no indication that he is currently terminal. Significantly, in the case at bar, there is conflicting, rather than concurring, medical testimony regarding whether continuing the life-sustaining treatment he presently receives would impose an extraordinary burden on D. Furthermore, the doctors testified that D may live one to two years; thus, with the ventilator, there is a reasonable hope of maintaining life.
This court credits the testimony of the treating physician, Dr. Ciminera, that the continuation of the ventilator will not impose *574 an extraordinary burden on D, over that of the physician on the medical ethics committee, Dr. Mondschein, who testified that he did not have experience with Hunter syndrome and was not well versed in D’s care and condition. There was no consulting physician. Therefore, the only other medical testimony offered was that of Dr. Mondschein. It is noted that, while Dr. Mondschein testified that removal of the ventilator was medically acceptable, the ethics committee noted in the chart their support to wean D from the ventilator as opposed to removing it. Dr. Ciminera testified that he attempted to wean D from the ventilator but was unsuccessful because D’s breathing became very rapid and he appeared to be in pain.
This decision is made with heartfelt appreciation for all that D and his parents have endured, what they are now going through and with compassion for what lies ahead for this family. The parents are devoted, conscientious, sincere, loving and trying to do what is best for their child. They have prepared themselves to accept the inevitable and love D enough to let him go. Based upon the evidence adduced at the hearing, however, this court does not find that it has been proven by clear and convincing evidence that it is in D’s best interest to withdraw the ventilator while he is alert, responsive, seemingly pain free and the burdens of prolonged life are not so great so as to outweigh any pleasure, emotional enjoyment or other satisfaction that D may yet be able to derive from life.
After due deliberation, the court finds that the patient lacks the capacity to make reasoned decisions concerning his treatment and that the request of his parents to discontinue his medical treatment is premature and not in his best interest at this time. This decision is in no way meant to bind the hands of D’s parents and treating physicians prospectively, in the event that D’s condition changes and there is agreement on the part of the family and health care providers as to the correct medical course of treatment. The parents’ right to work with the medical community to reach a medically appropriate decision on behalf of their son is still viable, recognized and respected by this court.
Now, upon motion of Abrams, Fensterman, Fensterman, Sis-man, Greenberg, Formato & Finger, LLP, attorneys for the petitioner, it is ordered and adjudged that the application of petitioner be and the same is hereby granted to the extent hereinafter provided; and it is further ordered and adjudged that Nassau University Medical Center, and its physicians, nursing *575 staff, and other designated employees and agents are authorized to provide medical treatment to DH; and it is further ordered and adjudged that the record in this proceeding is sealed, except to the parties who have appeared herein, their attorneys, appropriate court personnel and other court appointees, including the guardian ad litem herein, on the grounds that this proceeding involves confidential and privileged information as defined pursuant to 22 NYCRR part 216.