OPINION OF THE COURT
Michael L. Pesce, J.
Upon the papers and the bedside hearing conducted on February 8 and 10, 2017 the application by Fern Finkel, Esq.,[1] court appointed counsel to Valerie Pescatore, for orders: (1) restraining successor personal needs guardian, Charles Emma, Esq., from consenting to have Ms. Pescatore dialyzed or to *571 receive artificial hydration and nutrition and (2) removing the court appointed successor personal needs guardian is denied for reasons set forth below.
Brief Statement of Facts
Ms. Pescatore has been a ward of the court since May 15, 1997. She is currently 58 years old. At the time the guardianship was commenced Ms. Pescatore was being sued for divorce by her then husband. In the divorce proceeding Goldah Magill, Esq., was appointed as guardian ad litem (GAL). The GAL had entered into a stipulation of settlement which required the GAL to apply for a guardian and to petition to have a supplemental needs trust (SNT) established since Ms. Pescatore was to receive certain monies in equitable distribution. The guardianship petition, verified December 11, 1996, sought to protect Ms. Pescatore’s financial interests, which would have been jeopardized without a property guardian and an SNT.
The guardianship petition alleged that in March 1993, Ms. Pescatore took an overdose of lithium that resulted in a 25-day coma and that in September 1993, she had jumped into the East River upon discharge from a psychiatric ward. The petition nominated Ms. Magill and Mr. Burdock, one of Ms. Pesca-tore’s uncles, as property co-guardians and cotrustees. Ms. Pes-catore did not appear for the guardianship hearing as she had consented in writing to the appointment of the GAL and Mr. Burdock as property co-guardians/trustees.
Maria C. Marinello, Esq., the court evaluator, reported that at the time of the proceeding Ms. Pescatore had severe psychiatric diagnoses including manic depression and a schizophrenic disorder. She was then a resident of Methodist Hospital Psychiatric Ward and had been there for approximately one month. Ms. Pescatore told the court evaluator that she first started to have mental problems in her twenties. The report further claimed that Ms. Pescatore was cooperative with Mr. Burdock and he aided her with personal care decisions. Ms. Pescatore’s treating doctor stated that her insight and judgment were poor and that she needed constant supervision, which Mr. Burdock provided.
Since Ms. Pescatore had been living in a residence, and was under the age of 65, that portion of the order to show cause seeking to establish a supplemental trust was granted as prudent Medicaid planning. The court also appointed the two nominees as property co-guardians/trustees as Ms. Pescatore *572 had consented to the appointments in writing. No personal needs guardian was appointed, though in reality Mr. Burdock, the only close relative of Ms. Pescatore, was already acting as such.
The order and judgment was signed May 15, 1997. On February 6, 1999, an amended order and judgment was signed appointing Ms. Laura Messiana, Esq., in the place of Ms. Magill. Thereafter Laura Messiana was allowed to resign and on October 4, 2004, an order was signed appointing Leonard Spec-tor, Esq., as property co-guardian/trustee in the place of Ms. Messiana. Mr. Burdock passed away in 2007. On August 21, 2007, Mr. Spector moved to have a “successor” personal needs guardian appointed and also requested to be the sole property guardian/trustee. Ms. Pescatore was in court when the motion was heard. She did not object to the relief requested, recited the psychotropic medications she was taking, and stated she was happy with her residence (see tr Sept. 27, 2007 at 3). The motion was granted and on November 19, 2007, the court signed an order appointing Mr. Charles Emma, Esq., as Ms. Pescatore’s “successor” personal needs guardian and Mr. Spec-tor the sole property guardian/trustee.
On July 18, 2011, the court signed an order allowing Mr. Emma to consent to surgery or other treatments of Ms. Pesca-tore’s renal cancer. At that time Ms. Pescatore said that she had no quality of life, and did not wish to treat her cancer. Once the surgery was completed and Ms. Pescatore was recovering, she told Mr. Emma that she felt better and that Mr. Emma was correct in his decision to proceed with the surgery. In or around September 2016, it was determined that Ms. Pescatore needed dialysis. Since that time Ms. Pescatore receives dialysis three times weekly, but at times, has expressed opposition.
On November 18, 2016, Mr. Emma moved the court for an order to appoint counsel to Ms. Pescatore to aid her in decision-making regarding dialysis and to have a genealogist appointed so that relatives might be found to visit her. The unopposed motion was granted and Fern Finkel, Esq., was appointed as counsel to Ms. Pescatore and La Salle Services Inc. was appointed as genealogist.
Ms. Pescatore currently is bed bound with contractions in her limbs. She has bed sores, one on her sacrum and one on her earlobe. She has some recurring pneumonia due to food aspiration and diabetes, and is reported to be in end stage *573 renal failure. The need for dialysis prevents her from receiving all but one of her psychotropic medications, the antidepressant Celexa, and limits her to receiving only Tylenol for pain. She cannot receive opiates or her other psychotropic medications because they lower her blood pressure and if combined with the dialysis, which removes fluid from the blood, could result in her blood pressure being lowered to a fatal level.
Contentions of the Parties
Movant contends that Mr. Emma should be removed as personal needs guardian because Ms. Pescatore was never properly noticed that a personal needs guardian would be appointed in violation of her “due process protections.” Movant argues that Ms. Pescatore should be allowed to make her own health decision because she has no properly appointed surrogate for health care decisions. Movant further seeks a permanent injunction against Mr. Emma from consenting to any medical treatment Ms. Pescatore opposes including, but not limited to nasogastric (NG) or a percutaneous endoscopic gastronomy feeding tube and/or hydration claiming that Mr. Emma’s consent to those treatments violates his obligations under the Family Health Care Decisions Act (FHCDA).
Mr. Emma argues that Ms. Pescatore is incompetent to make decisions about medical treatment and that he is the proper surrogate to make her health care decisions and that he has made a proper decision under the FHCDA.
Applicable Law
“[A] competent adult generally has the right to make health care decisions, including the right to refuse life-sustaining treatment” (Matter of M.B., 6 NY3d 437, 439 [2006]; see also Public Health Law § 2504 [1] [providing that a person who is 18 years old or older may “give effective consent for medical, dental, health and hospital services for himself or herself, and the consent of no other person shall be necessary”]). However, the Court of Appeals held that where patients are incapacitated, and therefore, lack decision-making capacity, “clear and convincing evidence” of a person’s desire, prior to becoming incapacitated, to refuse life-sustaining treatment was required, such as a health care proxy (Matter of Westchester County Med. Ctr. [O’Connor], 72 NY2d 517, 530-532 [1988]; see also Public Health Law § 2994-d [3] [a] [ii]; Matter of Regina L.F. [Lisa R.], 132 AD3d 1344, 1345 [4th Dept 2015]). The Court of Appeals *574 reasoned that “[e]very person has a right to life, and no one should be denied essential medical care unless the evidence clearly and convincingly shows that the patient intended to decline the treatment under some particular circumstances” (O’Connor at 530-531). Clear and convincing evidence was defined as meaning “proof [of the patient’s] firm and settled commitment to the termination of life supports” (id. at 531).[2]
In 2010, the enactment of the FHCDA, Laws of 2010, chapter 8, added article 29-CC to the Public Health Law. The intent of the FHCDA was to establish a decision-making process applicable for patients in hospitals and nursing homes who lacked decision-making capacity and were without advance directives, such as a health care proxy (L 2010, ch 8, § 1). It marked a significant change in the law governing health care by a surrogate for an incapacitated person in a hospital or nursing home. Decisions by a guardian appointed pursuant to the Mental Hygiene Law are included with the applicability of the FHCDA.
The decision-making standards in Public Health Law § 2994-d (4) under which the guardian must act pursuant to Mental Hygiene Law § 81.22 (a) (8) are that the guardian’s choices regarding health care decisions for the incapacitated person must be “in accordance with the patient’s wishes, including the patient’s religious and moral beliefs” (Public Health Law § 2994-d [4] [a] [i]). The guardian must give effect to the incapacitated person’s prior known competent wishes and her past values and preferences. “[I]f the patient’s wishes are not reasonably known and cannot with reasonable diligence be ascertained, [the guardian’s decisions regarding health care for the incapacitated person must be] in accordance with the patient’s best interests” (Public Health Law § 2994-d [4] [a] [ii]). “The application of the best interests standard, is often understood to reflect [the] societal consensus, or a ‘reasonable person,’ choosing as most people would choose for themselves” (Matter of Doe, 53 Misc 3d 829, 857 [Sup Ct, Kings County 2016]). In addition “ ‘[c]ourts have looked to determine the patient’s best interests by deciding whether the evidence establishes that the burdens of prolonged life outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life’ ” (Matter of Kahn v Kramer, 46 Misc 3d 1204[A], 2014 NY Slip Op 51893 [U], *8 [Sup Ct, Kings County 2014], quoting Matter of DH, 15 Misc 3d 565, 571 [Sup Ct, Nassau County 2007]).
*575 Issues Presented
To properly determine this motion this court must decide the following issues: Is Ms. Pescatore competent to make her own medical decisions. If she has the capacity to make health care decisions no further analysis is needed. However, if she is not competent this court must decide if Mr. Emma is an appropriate surrogate and if Mr. Emma properly executed his obligations under the FHCDA and case law.
On January 25, 2017, and February 2, 2017, Ms. Pescatore was examined by Alexander Heisman, M.D., an expert psychiatrist, who found, within a reasonable degree of medical certainty, that Ms. Pescatore is unable to understand the nature and consequences of her decision to terminate dialysis thus lacking capacity to make decisions. This persuasive testimony is further supported by numerous affirmations by the hospital’s psychiatrists contained in the hospital chart according to the testimony of Mariana Ivanyuk, M.D., a staff palliate care physician at Coney Island who flatly stated that Ms. Pescatore lacks capacity (see tr Feb. 8, 2017 at 47-48, 68). These conclusions were predicated on Ms. Pescatore’s delusions and her reactions to the dialysis are based in large measure upon those delusions. She believes when she undergoes dialysis she is in “a war” and the “machine breaks her arms.” Her assessment of the dialysis is not based in reality (see court exhibit 1). Moreover, Ms. Pescatore has told various people that she will not die if she discontinues dialysis. Even if the movant were to argue that Ms. Pescatore’s decision to forgo dialysis is a moment of lucidity, such argument would have to be supported by clear and convincing evidence. Dr. Boris Bludoy, Ms. Pesca-tore’s attending physician, was called by Ms. Finkel and testified that in his opinion Ms. Pescatore understands her decision to refuse dialysis sufficiently to give informed consent (see tr Feb. 10, 2017 at 99). However, given the expert testimony of Dr. Heisman, Ms. Pescatore’s vacillations about dialysis, and her statements that she will not die if she stops dialysis, Dr. Bludoy’s opinion is insufficient to rise to the level of clear and convincing evidence.
The second issue is whether Mr. Emma is a proper surrogate, in spite of the procedural incorrectness of his appointment.
Mr. Emma has acted as Ms. Pescatore’s guardian for the past 10 years. He is her only known visitor, making bimonthly *576 or biweekly visits and speaking to her regularly over the telephone (see testimony attached to the orders confirming annual accounts for 2010 through 2015).
In fact Ms. Finkel stated:
“I can tell you that in the ten years, I think Mr. Emma may be the only person that has ever visited her ... I think that Mr. Emma visited more than the required statutory amounts. I think he has a very legitimate bond, a very loving bond with Valerie. I think he is literally pained by this. I think he truly cares for her. In no way do I feel that he has done anything against her interests, however, the fact remains he is not her properly appointed Surrogate decision-maker. That is a procedural issue for the Court” (see tr Feb. 10, 2017 at 119).
While technically correct in her argument, Ms. Finkel admits to the unquestionable assistance that, at first Mr. Burdock, then Mr. Emma, rendered Ms. Pescatore with her personal activities of daily living. Had Mr. Spector asked for a personal needs guardian rather than a “successor,” Mr. Emma would still be in the same role, making the same decisions. While not statutorily correct, Ms. Pescatore was indeed on notice that a personal needs guardian would be appointed, whether “successor” or not, as she was served with Mr. Spec-tor’s motion and was present in the courtroom. Immediately thereafter Mr. Emma and Ms. Pescatore had numerous conversations and met each other regularly, establishing a close connection. Moreover, even if Mr. Emma, who acting pursuant to court order and properly commissioned, was found not to be Ms. Pescatore’s “successor” personal needs guardian, given the bond between Mr. Emma and Ms. Pescatore, this court finds that he is in fact her only friend, which qualifies him as Ms. Pescatore’s surrogate under the FHCDA (see Public Health Law § 2994-d [1] [f]). That friendship should not be tainted by the fact that Mr. Emma’s introduction to Ms. Pesca-tore was predicated on his appointment as her “successor” personal needs guardian rather than simply her personal needs guardian. The FHCDA was designed so that people close to the incapacitated person needing treatment make the decision and that such person would be in the best position to so decide, as they know the patient best, and thus be best able to make the decision consistent with the obligations imposed upon the sur *577 rogate by the FHCDA. This court concludes that, given all the circumstances in this case, Mr. Emma is a proper surrogate.[3]
The last question for this court to consider is whether Mr. Emma’s decision to continue dialysis and the NG tube fulfilled his obligations under the FHCDA.
Ms. Finkel argues that even if Mr. Emma is a proper surrogate, while not conceding that fact, he has failed to properly exercise his obligations as surrogate under the FHCDA because his decision to implement dialysis and the NG tube is not in Ms. Pescatore’s best interests and is inconsistent with Ms. Pes-catore’s stated desires. She argues that Mr. Emma’s decision is based on his own beliefs to wit: who is he to end her life and that decision rests in God’s hands.
Public Health Law § 2994-d (5) governs decisions to withhold or withdraw life-sustaining treatment. To withhold dialysis from someone in end stage renal disease would be a decision governed by Public Health Law § 2994-d (5) which first directs the surrogate to Public Health Law § 2994-d (4).
Public Health Law § 2994-d (4) (a) (i) states that the surrogate shall make health care decisions in accordance with the patient’s wishes, including the patient’s religious and moral beliefs or if the patient’s wishes are not known and cannot be ascertained with due diligence then pursuant Public Health Law § 2994-d (4) (a) (ii) the surrogate must make
“[a]n assessment of the patient’s best interests [which] shall include: consideration of the dignity and uniqueness of every person; the possibility and extent of preserving the patient’s life; the preservation, improvement or restoration of the patient’s health or functioning; the relief of the patient’s suffering; and any medical condition and such other concerns and values as a reasonable person in the patient’s circumstances would wish to consider.”
Public Health Law § 2994-d (4) (b) requires that Mr. Emma’s assessment of the patient’s wishes and best interests be patient-centered, i.e., designed specifically for the patient.
Since there is a lack of information regarding Ms. Pesca-tore’s desires as to life-sustaining procedures when she had capacity, the court must look to other factors.
Pursuant to Public Health Law § 2994-d (5) (a) life-sustaining treatment may be declined or discontinued only if *578 the following two conditions are met. The first condition requires that the
“[treatment [is considered to be] an extraordinary burden to the patient and an attending physician [so] determines, with the independent concurrence of another physician . . . to a reasonable degree of medical certainty and in accord with accepted medical standards, (A) the patient has an illness or injury which can be expected to cause death within six months ... or (B) the patient is permanently unconscious” (Public Health Law § 2994-d [5] [a] [i]).
In the instant matter one opinion gives Ms. Pescatore a year to live if the treatment is provided nor is she permanently unconscious; thus Public Health Law § 2994-d (5) (a) (i) requires that the surrogate continue the dialysis and artificial hydration and nutrition.
Ms. Finkel contends that dialysis and the NG tube should be discontinued pursuant to Public Health Law § 2994-d (5) (a) (ii) because
“[t]he provision of treatment would involve such pain, suffering or other burden that it would reasonably be deemed inhumane or extraordinarily burdensome under the circumstances and the patient has an irreversible or incurable condition, as determined by an attending physician with the independent concurrence of another physician to a reasonable degree of medical certainty and in accord with accepted medical standards.”
Ms. Pescatore’s end stage renal disease is irreversible and incurable, but the deprivation of medications other than Tylenol and Celexa does not make the dialysis inhumane or extraordinarily burdensome. The argument that the dialysis and NG tube are too inhumane is not supported by the testimony of Dr. Ivanyuk, who testified that if the decision is to continue dialysis she should have even more treatment (see tr Feb. 8, 2017 at 49). There is no doubt that Ms. Pescatore expresses that she is in pain, but she has better days (see tr Feb. 10, 2017 at 103-104). She has complained of the pain of dialysis to Dr. Heisman, the expert psychiatrist, but never complained that dialysis was painful or that it hurt her arms to Dr. Boris Bludoy, her attending physician.
There is no doubt that someone with capacity in Ms. Pesca-tore’s situation might discontinue all treatment and such a de- *579 cisión would be reasonable, but it is also just as likely that a competent person would continue treatment, despite its burdens. To this court it appears that when faced with hardship, Ms. Pescatore’s default position is to articulate a desire to end her life. When she was sued for divorce, Ms. Pescatore made two serious suicide attempts. When diagnosed with renal cancer Ms. Pescatore would not consent to treatment. Asking her attorney to bring this application appears to be yet another instance of her default position, wherein Ms. Pescatore declares a wish to end her life. The FHCDA makes specific reference that the statute is not a device to achieve mercy killings or assisted suicides. Ms. Pescatore has a history of serious suicide attempts and this application smacks of mercy killing and assisted suicide.
It is this court’s conclusion that Ms. Pescatore lacks the capacity to arrive at a decision regarding her future, that Mr. Emma is a proper surrogate and has acted reasonably in making his decision and that the decision is supported by the statutory requirements as well as the case law heretofore discussed.
Now, upon due deliberation, it is hereby ordered that the motion is denied in its entirety.

. Ms. Finkel’s partner Julie Stoil Fernandez, Esq., prepared and signed the moving papers.

. O’Connor has been arguably superceded by the FHCDA.

. Even if Mr. Emma were not a proper surrogate, the court still would have rendered this decision pursuant to Public Health Law § 2994-g.